CITY OF SPRINGFIELD *vs.* DEPARTMENT OF TELECOMMUNICA-
TIONS AND CABLE & another.[1]

Suffolk. April 6, 2010. - August 16, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Telecommunications. License. Administrative Law,* Rate regulation, Judicial
review. *Supreme Judicial Court,* Jurisdiction. *Jurisdiction,* Administrative
matter. *Contract,* Construction of contract.

This court concluded that it had jurisdiction to review a decision of the
Department of Telecommunications and Cable (department), approving the
basic service tier programming rate to be charged by a cable television
service provider to subscribers in a city, where review of the city's claims
regarding that decision involved questions of State law that did not implicate
the relevant provisions of the Federal regulatory scheme or require this
court to determine whether the department had acted consistently with
Federal law. [566-567]

The Department of Telecommunications and Cable, in approving the basic
service tier programming rate to be charged by a cable television service
provider to subscribers in a city, correctly concluded that a provision in the
renewal licensing agreement between the city and the service provider,
which prohibited the service provider from "passing through" to subscrib-
ers any increase in its franchise related costs, permitted the service provider
to continue to include in its rate calculation the amount of franchise related
costs already embedded in the basic service tier rate applicable under the
previous licensing agreement. [567-572]

This court declined to consider arguments that were raised for the first time
on appeal. [572-573]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on February 2, 2009.

The case was reported by *Spina,* J.

*Harry P. Carroll* (*Edward M. Pikula,* City Solicitor, with
him) for the plaintiff.

*Thomas A. Barnico,* Assistant Attorney General, for the defend-
ant.

*Adam S. Caldwell,* of the District of Columbia (*Paul D. Abbott
& Daniel M. Glanville* with him) for the intervener.

[1]Comcast Cable Communications, Inc. (Comcast), intervener.

GANTS, J. The city of Springfield (city) sought review in the Superior Court of a 2008 order of the Department of Telecommunications and Cable (department) approving the basic service tier programming rate to be charged by Comcast Communications, Inc. (Comcast), to cable television service subscribers in the city under the terms of a cable television service provider license agreement (renewal license) between the city and Comcast. Under the renewal license, subscribers must pay the basic service tier rate to receive the basic programming that Comcast offers as a minimum or entry level service; subscription to the basic service tier is also required for access to any other tier of service.[2] Following a motion by the department, a single justice transferred the case to the county court pursuant to G. L. c. 211, § 4A.[3],[4] Comcast was granted leave to intervene and moved to dismiss the appeal for lack of jurisdiction. The single justice then reserved and reported the case without decision to the full court.

The present controversy concerns the interpretation of one provision in the renewal license entered into by Comcast and the city in August, 1998. Section 8.1(d) of the renewal license states:

"The Issuing Authority [city] acknowledges that under the 1992 Cable Television Protection and Competition

---

[2]The basic service tier of cable television programming consists of local broadcast stations and public, educational, and governmental access channels associated with a local cable television system. See 47 U.S.C. § 543(b)(7)(a) (2006); 47 C.F.R. § 76.901(a) (2009). See also D.L. Brenner, M.E. Price & M.I. Meyerson, Cable Television and Other Nonbroadcast Video § 7:6 (2010).

[3]In 2008, the Legislature eliminated the jurisdiction of the Superior Court over appeals seeking judicial review of decisions of the Department of Telecommunications and Cable (department) and provided that such appeals shall be taken to the Supreme Judicial Court for Suffolk County. See St. 2008, c. 522, §§ 22, 34, amending G. L. c. 166A, §§ 2, 15. The city of Springfield (city) had filed its appeal on December 16, 2008, in the Superior Court prior to the April 15, 2009, effective date of the legislation. See G. L. c. 166A, § 15, fourth par., repealed by St. 2008, c. 522, § 34.

[4]On March 31, 2009, the city brought suit against Comcast in the Superior Court alleging fraud and breach of contract. Comcast removed the case to the United States District Court for the District of Massachusetts based on diversity jurisdiction. See 28 U.S.C. § 1332 (2006). That court has stayed the proceedings in order to allow this court to rule on the matter of the department's interpretation of the relevant terms of the renewal license.

Act, certain costs of PEG [public, educational, and governmental] Access and other license requirements, may be passed through to the Subscribers in accordance with federal law. The Issuing Authority and the Licensee [Comcast], in consideration of the mutual promises and undertakings reflected in this Renewal License, agree that the cost of PEG Access and the license requirements contained in Sections 3.5 (Construction of an Advanced Institutional Network), Section 6.1 (PEG Access/Local Origination Channels and Support), Section 6.2 (Community Studio and Equipment), Section 6.3 (Operation of Community Studio; Staff and Support), Section 6.4 (Funding for Telecommunications and Economic Development Fund) and Section 8.2 (Senior Discount) *will not be passed through as external franchise related costs to Subscribers* so long as this Renewal License remains in force and effect, not withstanding any provision of law, as may be amended, to the contrary" (emphasis added).

The city contends that the unambiguous meaning of the italicized language is that none of the costs known as "franchise related costs" may be included in Comcast's calculation of the basic service tier rate for the city's subscribers during the period covered by the renewal license — January 29, 2000, to January 28, 2010. Comcast contends, and the department concluded, that in the context of cable television service provider franchise license agreements, the term "pass through" is a term of art and that, when the italicized language is understood in its technical sense, this provision means that Comcast may not pass through to subscribers any *increase* in its franchise related costs, but may continue to include in its rate calculation the amount of franchise related costs already embedded in the basic service tier rate applicable under the previous license agreement. We now affirm the order of the department.

1. *Background.* Comcast is the largest provider of cable television services in the Commonwealth and has provided cable television services to the city since at least 1997 under license agreements entered into in accordance with G. L. c. 166A, § 3.[5] Because Comcast does not face "effective competition" for

---

[5]The cable television service provider license agreement (renewal license) at issue here was entered into between the city and MediaOne of Western New England, Inc. (MediaOne), which provided cable television services to

cable television services in the city as defined by the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102 385, 106 Stat. 1460 (1992), codified at 47 U.S.C. §§ 522 et seq. (2006) (Cable Act), the rates it charges to consumers for basic service tier programming under its license with the city are subject to oversight and regulation by the department, which, in executing this regulatory function, serves as the Commonwealth's "franchising authority" under Federal law. See 47 U.S.C. §§ 522(10), 543(1) (2006); 47 C.F.R. §§ 76.905, 76.922 (2009); G. L. c. 166A, § 15; 207 Code Mass. Regs. § 6.02 (1996). In late 2007, Comcast made an annual filing with the department of proposed cable television programming service rates for those Massachusetts communities, like the city, subject to rate regulation at the time of filing. Notice was published of the rate proceeding, and the city moved to intervene to challenge the basic service tier rate Comcast sought to charge the city's subscribers. 801 Code Mass. Regs. § 1.01(9) (1998). The department allowed the city's motion, and after discovery was completed, the department convened a public rate hearing on June 25, 2008.

The city argued that, since January 29, 2000, when the renewal license took effect, Comcast had impermissibly been passing through to subscribers its franchise related costs by including those costs in its calculation of the basic service tier rate, in violation of § 8.1(d) of the renewal license, and that Comcast's latest rate filing continued this practice. The city requested that the department order Comcast to rebate to the city's subscribers, with interest, all amounts collected by Comcast since January, 2000, in violation of § 8.1(d), and that Comcast eliminate all franchise related costs from its calculation of the basic service tier rate going forward.

Comcast argued that the city's reading of § 8.1(d) contradicted the understanding and intent of the parties in entering into the 1998 renewal license. According to Comcast, § 8.1(d) did not restrict its ability to continue to pass through to subscribers franchise related costs that had applied under the prior license

the city under an earlier license agreement at the time of the renewal. Subsequent to the renewal, Comcast acquired ownership of MediaOne's cable television systems and became the successor-in-interest to MediaOne under the renewal license. We shall refer to the licensee under the agreement as Comcast.

agreement and that were therefore embedded in the basic service tier rate established at the time of the license renewal. The provision, Comcast argued, prohibited only the pass through of *additional* or incremental franchise related costs resulting from new franchise related obligations introduced by the renewal license. Comcast claimed that, in entering into the renewal license, the parties had understood that Comcast would continue to include historically embedded costs in its future rate calculations.

Following the department hearing and the parties' submission of posthearing briefs, the department issued a November 17, 2008, rate order in which it adopted Comcast's position that the "pass through" restriction in § 8.1(d) of the renewal license applied only to incremental increases in franchise related costs associated with obligations introduced by the renewal license and not to embedded franchise related costs carried over from the prior license agreement. On the basis of its interpretation of the term "pass through," the department found that Comcast's basic service tier rate calculations complied with § 8.1(d) of the renewal license and approved the company's rate filing.

2. *Jurisdiction.* Comcast argues that this court must dismiss the city's appeal for lack of jurisdiction. The Cable Act permits State and local governments to participate in basic cable television service regulation, but only in accordance with the requirements of the Act and corresponding Federal Communications Commission (FCC) regulations. 47 U.S.C. §§ 543(a)(1), 556(c) (2006). See 207 Code Mass. Regs. § 6.01 (1996) (adopting FCC rate regulations in entirety for purposes of cable television service rate oversight). According to Comcast, the relevant FCC regulations mandate that the FCC itself has exclusive jurisdiction over the city's appeal from the department's rate order. We disagree.

Comcast's argument relies on an FCC regulation that states in part:

> "The [FCC] shall be the sole forum for appeals of decisions by franchising authorities on rates for the basic service tier or associated equipment involving whether or not a franchising authority has acted consistently with the Cable Act or §§ 76.922 and 76.923. Appeals of ratemaking decisions by franchising authorities that do not depend upon

determining whether a franchising authority has acted consistently with the Cable Act or §§ 76.922 and 76.923, may be heard in state or local courts."

47 C.F.R. § 76.944(a) (2009). The city makes no claim in appealing from the department's rate order that the order conflicts either with the Cable Act or with §§ 76.922 and 76.923 of the FCC's regulations. Instead, the city claims that the department's decision is without proper legal basis, both under the standard applicable to agency decision-making under the Administrative Procedure Act, see G. L. c. 30A, § 14 (7), and under common-law principles governing contract interpretation.[6] These are questions of State law that do not implicate the relevant provisions of the Federal regulatory scheme or require us to determine whether the department "has acted consistently with the Cable Act or §§ 76.922 and 76.923.'"[7] See *Chicago* v. *Comcast Cable Holdings, LLC*, 384 F.3d 901, 905 (7th Cir. 2004) ("Unlike, say, the National Bank Act, which knocks out all state regulation of national banks' interest charges, so that any claim must rest on federal law alone . . . the [Cable] Act leaves to state law most questions about the regulation and taxation of cable TV franchises"). Therefore, we conclude that Federal law does not prohibit our review of the department's decision, and proceed to consider the merits of the appeal.

3. *Analysis.* In reviewing administrative agency decisions, we give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14 (7). See *Raytheon Co.* v. *Director of the Div. of Employment Sec.*, 364 Mass. 593, 595 (1974). "The burden of proof is on the appealing party to show that the order appealed from is invalid, and

---

[6]The city's appeal also raises for the first time a number of procedural and constitutional claims, which we do not address for the reasons we discuss *infra*.

[7]There is no claim that the rate order fails to conform to the requirements of 47 C.F.R. § 76.922 (2009), which establishes a methodology for calculating permissible basic service tier programming rates. Rather, the city's claim is that the rate order does not comply with the contractual terms of the renewal license. No conflict with § 76.923 can be at issue, as that section governs the methodology for calculating rates that cable television service providers may permissibly charge for equipment and installations, rather than programming services. 47 C.F.R. § 76.923 (2009).

we have observed that this burden is heavy." *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867 (1997). Where an agency finding is one of fact and is supported by substantial evidence, it will not be disturbed by a reviewing court. G. L. c. 30A § 14 (7). See *Raytheon Co.* v. *Director of the Div. of Employment Sec., supra.* Where an agency's determination involves a question of law, however, it is subject to de novo review. See *Bulger* v. *Contributory Retirement Appeal Bd.*, 447 Mass. 651, 657 (2006); *Raytheon Co.* v. *Director of the Div. of Employment Sec., supra.*

In interpreting a contractual agreement that employs clear and unambiguous language, we look first to the ordinary meaning of the language in the contract. See *General Convention of the New Jerusalem in the U.S., Inc.* v. *MacKenzie*, 449 Mass. 832, 835-836 (2007). However, where, as here, we consider a specialized contract subject to a complex regulatory scheme, we recognize that language that appears to have an ordinary meaning may carry a technical meaning not obvious to a layperson. See *Pennsylvania R.R.* v. *Day*, 360 U.S. 548, 553 (1959) ("provisions in railroad collective bargaining agreements are of a specialized technical nature calling for specialized technical knowledge in ascertaining their meaning and application"). Words in an agreement are given their ordinary and usual sense "unless it appears that [the words] are to be given a peculiar or technical meaning." *Davis* v. *Dawson, Inc.*, 15 F. Supp. 2d 64, 109 (D. Mass. 1998), quoting *Woogmaster* v. *Liverpool & London & Globe Ins. Co.*, 312 Mass. 479, 481 (1942). See *Lodge Corp.* v. *Assurance Co. of Am.*, 56 Mass. App. Ct. 195, 197 (2002) (language of construction insurance policy must be interpreted based on both "the common and [the] technical understanding of the words"); Restatement (Second) of Contracts § 202(3) (1981) (technical terms and words of art are given technical meaning when used in transaction within specialized field unless contrary intention manifested in agreement). Because of its specialized knowledge, technical competence, and experience in the cable television industry, the department possesses the expertise to determine whether the language in question constitutes a term of art in that industry. See *MCI Telecomm. Corp.* v. *Department of Telecomm. & Energy*, 435 Mass. 144, 150-151 (2001).

The department interpreted § 8.1(d) of the renewal license in light of the terms of a settlement agreement entered into on November 6, 1997, between Comcast and a group of municipalities that had intervened to challenge Comcast's 1996 rate filing with the department. The city was among the cities and towns for which rates were filed, but it did not choose to intervene to challenge Comcast's proposed rates. The department found that the 1997 settlement agreement resolved a dispute between Comcast and the interveners as to whether Comcast's franchise related costs may "pass through" to subscribers in rate filings based on renewal licenses and, in so doing, established "pass through" as a term of art as applied to the treatment of franchise related costs under renewal licenses. The practical effect of the settlement agreement was to establish that franchise related costs that are carried over from an original to a renewal license may not serve as the basis for cost related rate increases in a cable television service provider's annual rate filings; instead, only incremental costs resulting from new obligations imposed by a renewal license may be "passed through" to subscribers in the form of increased rate filings.[8] In ruling on the present dispute, the department explained that, as the term is used in the settlement agreement, a pass through "only exists where there is an increase in a licensee's [franchise related costs] as a result of new obligations under a renewal license." Franchise related costs carried over from a prior license agreement continue to be included in the calculation of the basic service tier rates charged to subscribers in renewal licenses, but under the specialized terminology of the settlement agreement, these are understood as "an embedded part of the basic service tier rate" rather than as a cost "passed through" to subscribers.[9]

---

[8]The department asserted that this treatment was consistent with the policy of the Federal Communications Commission (FCC). Specifically, it noted advice issued by the FCC that, where the costs of complying with franchise requirements remain constant on the renewal of a license, basic service tier rates should not be adjusted, but that basic service tier rates may be adjusted to reflect franchise related costs that a cable television service provider would not have incurred but for new franchise requirements associated with a license renewal.

[9]The settlement agreement provides examples that clarified its resolution of this dispute. If the original license required an annual $100,000 local programming operating budget, but the renewal license required an annual $150,000 operating budget, only the incremental $50,000 amount may "pass through"

On November 13, 1997, the department[10] issued an order accepting the terms of the settlement agreement (acceptance order), and declared that its terms would apply in that rate proceeding and thereafter to all Comcast franchises in the Commonwealth, including the city and, prospectively, to all future Comcast franchises in the Commonwealth. The department concluded that the acceptance order, which was issued approximately nine months before Comcast and the city executed the renewal license, established the context for their negotiations regarding the "pass through" of franchise related costs. Under the terms of the acceptance order, Comcast was permitted to pass through to subscribers in a renewal license any incremental increase in franchise related costs, but Comcast relinquished this right in § 8.1(d) of its renewal license with the city. Because a "pass through" under the acceptance order refers only to an incremental *increase* in franchise related costs in a renewal license, the department interpreted the limitation in § 8.1(d) that franchise related costs "will not be passed through as external franchise related costs to Subscribers" to prohibit only the pass through of any increase in franchise related costs in calculating the basic service tier rate, not the inclusion of the embedded franchise related costs in such a calculation.

In reaching its decision, the department also observed that § 9.12(a) of the renewal license incorporates by reference "[a]ll presently and hereafter applicable conditions and requirements of federal, state and local laws, including but not limited to . . . the rules and regulations of the FCC and the [department]," and concluded that the renewal license thereby incorporates by reference the acceptance order. Section 9.12(a) goes on to state that "[a]ll such general laws, rules, and regulations, as amended,

---

to subscribers as franchise related costs and be used to calculate an increase in the basic service tier rate. If the renewal license required the same $100,000 operating budget, there would be no "pass through," and therefore no increase in the basic service tier rate based on franchise related costs, because the $100,000 was already embedded in the calculation of the basic service tier rate under the original license.

[10]At the time, the agency charged with regulating cable television service rates was the cable television division within the Department of Public Utilities. As of 2007, these duties were assigned to the newly created Department of Telecommunications and Cable. St. 2007, c. 19, § 29. For simplicity, we refer to the regulatory agency as "the department" throughout.

*shall control the interpretation and performance of this Renewal License* to the extent that any provision of this Renewal License conflicts with or is inconsistent with such laws, rules or regulations" (emphasis added).[11] It would have been impossible for any authority charged with interpreting the renewal license to understand fully its terms without consulting the relevant "conditions and requirements" that the department had applied to Comcast and the city with regard to basic service tier rate calculations. For these reasons, the department did not err in interpreting the language in § 8.1(d) of the renewal license by reference to the acceptance order and the settlement agreement.

The department's interpretation of "pass through" as a specialized term of art is consistent with its treatment of the term in other contexts. The record reflects that, in a series of publicly issued rate orders that stretch at least from September 30, 1998, to September 26, 2006, the department has consistently applied both the specialized meaning it has assigned to the term "pass through" and the policy underlying it. These decisions show that, where the department has allowed cable television service providers to treat franchise related costs as a basis for raising the basic service tier rate under license renewal agreements, it has allowed the "pass through" only of incremental increases in such costs. In its orders, the department has indicated that this policy is consistent with FCC regulations and industry practice.[12]

The department offered two additional reasons in support of its interpretation of the meaning of "pass through" in § 8.1(d) of the renewal license. First, the department pointed to a February, 1998, memorandum of understanding prepared by the city and sent to Comcast that summarized the material terms of the agreement the parties had reached and planned to memorialize in the renewal license. The memorandum provided that Comcast would "waive any rights under applicable law to pass on

---

[11]We have held that, in the proper circumstances, an administrative agency may establish rules of general application through its adjudicatory rather than its rule making process. See *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 383 Mass. 675, 679 (1981).

[12]See, e.g., Rate Order, In the Matter of Comcast Cable Communications, Inc., Docket No. CTV 04-3/04-4, 16-17 (August 30, 2005); Rate Order, In the Matter of Comcast Cable Communications, Inc., Docket No. CTV 03-1, 9-10 (December 23, 2003); Rate Order, In the Matter of Time Warner Cable, Docket No. Y-97 INC, 14-16 (September 30, 1998).

the cost of in-kind benefits[13] to City cable television subscribers, i.e., the subscribers' monthly cable television bills would *not increase* as a result of [Comcast's] payment of in-kind benefits" (emphasis in original). There is no suggestion in the memorandum that embedded franchise related costs would be eliminated from the basic service tier rate calculation going forward, and therefore no suggestion that these rates would *decrease*.

Second, the department noted that, if the renewal license had actually prohibited *all* franchise related costs from being used in the calculation of the city's basic service tier rate, the city should have anticipated an immediate drop in the rate with the commencement of the renewal license. No such reduction occurred. The department therefore found it significant that, although the renewal license has been in effect since January, 2000, and Comcast had made annual basic service tier rate filings with the department since that time, the city, until now, had not challenged Comcast's carryover of embedded franchise related costs in any rate proceeding. The department concluded that the city's conduct indicated that it had never expected a reduction in the basic service tier rate, because it had not understood § 8.1(d) to eliminate embedded franchise related costs from rate calculations made under the renewal license. "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202(4) (1981).

In light of the deference we give to the department's expertise and experience, particularly where this interpretive question arises under a complex statutory and regulatory framework, we conclude that the department's interpretation of the term "pass through" in § 8.1(d) of the renewal license is soundly based in law and supported by substantial evidence. See G. L. c. 30A, § 14 (7); *MCI Telecomm. Corp.* v. *Department of Telecomm. & Energy*, 435 Mass. 144, 150-151 (2001).

4. *Other issues raised on appeal.* In its appeal, the city makes

---

[13]The memorandum of understanding earlier described the costs characterized as "in-kind benefits," which included franchise related costs.

a number of other arguments that it did not raise in the proceedings before the department.[14] These include claims that the department's November, 2008, rate order constitutes an unconstitutional taking from the city, an impairment of its contract rights, and a deprivation of its vested rights. The city also alleges that the department's 1997 acceptance order was unlawful, either because the department exceeded the authority granted to it by the Legislature or because the department violated procedural requirements for agency action.[15]

Because the city did not raise these arguments before the department, we do not consider them on appeal. See *Hingham* v. *Department of Telecomm. & Energy*, 433 Mass. 198, 215-216 (2001); *Albert* v. *Municipal Court of Boston*, 388 Mass. 491, 493-494 (1983). We acknowledge that there may always be "*exceptional* cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below" (emphasis in original). *Id.* at 494, quoting *Hormel* v. *Helvering*, 312 U.S. 552, 557 (1941). This is not such a case.

The order of the department is affirmed.

*So ordered.*

.

---

[14]The city did not raise these arguments before the hearing, at the hearing, or in the posthearing brief it submitted at the department's request.

[15]Among the alleged procedural errors is the department's decision to exclude from evidence testimony given by the city's attorney at the June 25, 2008, rate hearing, which the city contends was arbitrary and capricious. As with the other claims, the city failed to preserve this ground of appeal by raising the objection below.