MARY GAUTHIER vs. DIRECTOR OF THE OFFICE OF MEDICAID.

No. 10-P-1585.

Norfolk. September 6, 2011. - November 10, 2011.

Present: KAFKER, GREEN, & GRAINGER, JJ.

*MassHealth. Medicaid.*

Substantial evidence supported the conclusion of a hearing officer in the Office
  of Medicaid (MassHealth) that the amount that an elderly woman (plaintiff)
  transferred under an agreement she entered into with her son to provide for
  her care represented a disqualifying transfer for purposes of her application
  for long-term MassHealth care benefits in a nursing home, where the agree-
  ment was not for fair market value, in that, although the plaintiff received
  the benefit under the agreement of a newly constructed living area, she
  received no ownership interest for her contribution to the construction costs,
  and in that, at the time of the transfer, the son could terminate his obligations
  under the agreement at any time [784-785]; further, the plaintiff failed to
  establish by convincing evidence that her transfer was made exclusively for
  a purpose other than to qualify for MassHealth benefits [785-786]; however,
  remand of the matter was necessary, where the hearing officer did not make
  findings and rulings regarding whether the plaintiff and her son intended to
  provide the plaintiff fair compensation for her contribution, even if they
  contemplated future nursing home care at State expense [786-787]; likewise,
  remand was necessary where this court discerned a gap or error in the
  analysis regarding the calculation of the resulting period of ineligibility
  [787-790].

CIVIL ACTION commenced in the Superior Court Department on
March 30, 2009.

The case was heard by *Elizabeth B. Donovan*, J., on motions
for judgment on the pleadings.

*Francis X. Small* for the plaintiff.

*Kirk G. Hanson*, Assistant Attorney General, for the defendant.

KAFKER, J. Mary Gauthier (Gauthier) transferred $182,000 to
her son and daughter-in-law approximately two years before ap-
plying to the Office of Medicaid (MassHealth) for long-term
care benefits in a nursing home. The money was used at least in

part to compensate her son (Scott) and daughter-in-law (Diane) for constructing a handicapped-accessible in-law apartment in their home and providing her lodging and care in the newly constructed area of the house. A care agreement' was entered into between Gauthier and her son at the time of the transfer. MassHealth found Gauthier's payment of $182,000 to be a disqualifying transfer within the applicable look-back period prior to her application for assistance.

Gauthier claims that the transfer should not have disqualified her for benefits because she received at least fair market value for it. She also argues that it was made exclusively for a purpose other than qualifying for MassHealth, and so satisfies an exception to ineligibility that applies to transactions for less than fair market value. We conclude that there was substantial evidence to support MassHealth's determination that Gauthier did not prove that this was a fair market value transaction or that it was made exclusively for a purpose other than qualifying for Mass-Health. However, a remand is required for two reasons. First, the hearing officer did not address a related exception to ineligibility that applies if Gauthier intended to engage in a fair market transaction. This exception applies even if the transaction was in actuality for less than fair market value. Second, MassHealth used the total value of the transferred asset ($182,000) to determine the ineligibility period, when the period of ineligibility is based instead on the "uncompensated value" of the transferred asset. We therefore remand to MassHealth for further findings and rulings on these two issues.

*Background law.* Medicaid, a cooperative Federal-State program, provides payment for medical services to individuals and families "whose income and resources are insufficient to meet the costs of necessary medical services." *Forman* v. *Director of the Office of Medicaid,* 79 Mass. App. Ct. 218, 222 (2011), quoting from 42 U.S.C. § 1396-1(1) (2006). See *Haley* v. *Commissioner of Pub. Welfare,* 394 Mass. 466, 467 (1985). "MassHealth is the agency within the Commonwealth 'responsible for the administration and delivery of health-care services to low- and moderate-income individuals.' 130 Code Mass. Regs. § 515.002(A) [2008]." *Forman, supra.* In order to receive Federal funds for this program, "MassHealth regulations and

practices must comply with all requirements imposed by Federal Medicaid law." *Ibid.*, citing *Haley, supra.* See 130 Code Mass. Regs. § 515.002(B) (2008).

Pursuant to those requirements, MassHealth will pay for nursing home care for residents who have no more than $2,000 in countable assets and meet other criteria. See *Shelales* v. *Director of the Office of Medicaid*, 75 Mass. App. Ct. 636, 637-638 (2009), citing 130 Code Mass. Regs. § 519.006 (2006). MassHealth has strict limitations on asset transfers made by applicants before applying for these benefits, in order to prevent individuals from giving away their assets to their family and friends and forcing the government to pay for the cost of nursing home care. See *Andrews* v. *Division of Med. Assistance*, 68 Mass. App. Ct. 228, 229 (2007). Specifically, if MassHealth determines that an applicant has made a "disqualifying transfer" of assets within the five years preceding the application for nursing home benefits, it imposes a period of ineligibility before the applicant can receive benefits. *Forman, supra* at 222-223, citing 130 Code Mass. Regs. §§ 520.018, 520.019 (2006). See G. L. c. 118E, § 28. This decision forces the applicant or her family to pay for her care during the ineligibility period.

If an applicant disposes of an asset in exchange for future services, that transaction "is considered to be a disqualifying transfer of assets to the extent that the transaction does not have an ascertainable fair-market value or if the transaction is not embodied in a valid contract that is legally and reasonably enforceable by the applicant." 130 Code Mass. Regs. § 520.007(J)(4) (2006). However, even if a disqualifying transfer has occurred, no ineligibility period will be imposed if the applicant "demonstrates to the MassHealth agency's satisfaction that (1) the resources were transferred exclusively for a purpose other than to qualify for MassHealth; or (2) the [applicant] intended to dispose of the resource at either fair-market value or for other valuable consideration. Valuable consideration is a tangible benefit equal to at least the fair-market value of the transferred resource." 130 Code Mass. Regs. § 520.019(F) (2006).

The ineligibility period (in months) imposed for a disqualifying transfer of assets is "equal to the total, cumulative, uncompensated value . . . of all resources transferred . . . divided

by the average monthly cost to a private patient receiving nursing-facility services in the Commonwealth of Massachusetts at the time of application, as determined by the MassHealth agency." 130 Code Mass. Regs. § 520.019(G)(1) (2006). The "uncompensated value" of a resource is defined as "the difference between the fair-market value of the resource or interest in the resource at the time of transfer less any outstanding debts and the actual amount the individual received for the resource." 130 Code Mass. Regs. § 515.001 (2005). Fair market value, in turn, is "an estimate of the value of a resource if sold at the prevailing price." 130 Code Mass. Regs. § 515.001 (2007). Therefore, if a disqualifying transfer occurred, the ineligibility period will be $(V-R)/C$ months long, where $V$ is the fair market value of the asset transferred, $R$ is the amount received for the asset, and $C$ is the average monthly cost of a nursing home determined by MassHealth.

*Facts.* In September, 2004, when Gauthier was seventy-nine years old, her psychologist concluded that she should no longer live alone. Gauthier suffered from Alzheimer's disease and presented numerous memory and cognitive deficiencies. On or about September 10, 2004, she moved in with Scott and Diane, and lived in the first-floor den of their house in Franklin. At that time, Gauthier was incontinent of bowel and bladder and required the use of a walker. She had fallen multiple times and been injured after forgetting to use her walker. Because Scott and Diane both worked, Gauthier used her Social Security income to pay for full-time adult day care. When they were home, Scott and Diane took care of Gauthier free of charge. Diane is a registered nurse with the Visiting Nurse Association, and was therefore particularly qualified to assist Gauthier.

Because the three bedrooms in the house were occupied by Scott, Diane, and their two children, Scott and Diane planned an addition and other upgrades for the home once Gauthier moved in. Some portions of these renovations were primarily for Gauthier's benefit, including a handicapped-accessible fourth bedroom and bathroom with roll-in shower and grab bars, and the expanded septic system required by the town of Franklin for a four-bedroom house. Gauthier also had a separate heating system for the addition so that she could control the temperature independently of the rest of the house. Other renovations were

primarily for Scott and Diane, such as a deck, a two-car garage, and a remodeled kitchen. Aside from the septic system, which was upgraded in 2005, these renovations commenced pursuant to an agreement with a contractor signed on March 19, 2006. That agreement included few details of the construction, only listing that certain payments would be due upon the start or completion of general items like "excavation," "electrical," and "plumbing." Scott and Diane paid the contractor directly. While the record contains a list of charges and payments made to the contractor, at no point were the costs of renovations earmarked between those for Gauthier's addition and those pertaining to other areas of the house. The record also does not disclose when Gauthier moved into the new addition, but the last payment was made to the contractor on November 24, 2006. The total cost of the renovations was nearly $320,000.

On March 30, 2006, Scott and Gauthier executed a document entitled "Care Agreement." The Care Agreement set forth the terms under which Scott would supply Gauthier with room, board, and other services in his house. It mandated that Scott would provide lodging, three meals per day, weekly housecleaning, and laundry. The lodging was to be in a newly constructed area of the house designed specifically for Gauthier, but Scott would retain title to the entire house. Scott was also responsible for taking Gauthier to doctor's appointments, as well as providing "personal assistance with bathing, dressing, . . . eating, . . . and incidental services." In exchange for these services, Gauthier was to make an up-front payment of $225,000, but pay no monthly fees. The agreement expressly provided that "the amount recited [($225,000)] shall be the compensation intended to be fair and sufficient compensation for the duration of [Gauthier's] lifetime."

The agreement could, however, be canceled by either party within ninety days. After that period, Gauthier would not receive a refund of any part of the up-front payment. The agreement is silent as to what, if any, refund Gauthier would receive if she canceled before ninety days elapsed.

Notably, two sections of the agreement permitted Scott to terminate the agreement, while retaining all of the money paid by Gauthier, if Gauthier could no longer care for herself. After the ninety-day period, "termination shall be only for good and sufficient cause . . . [including if Gauthier] is no longer able to

care for . . . her own personal needs, such as bathing, dressing, eating, etc." More specifically, section 20.2 provided:

> "*Death of Parent.* Except as provided above, the term of this Agreement shall commence on the date hereof and shall continue in full force and effect thereafter until the death of [Gauthier] or [Gauthier] is no longer able to care for . . . her own personal needs. In the event that this contract is terminated by the death of [Gauthier] or because . . . she is no longer able to care for . . . her own personal needs such as bathing, toileting, dressing, and/or eating, without assistance, then and in that event no refund of any kind will be due and owing to [Gauthier] regardless of the time period in which said death or incompetence occurs. [Scott] shall retain the full amount of all payments made by [Gauthier] and the property in question will belong wholly to [Scott]."

Prior to the signing of the Care Agreement, Gauthier needed assistance for bathing and toileting. Although the provision was not referenced by the hearing officer, the agreement did, however, provide that Scott "shall use all sources available to [him] to bring services into the [house] so as to allow [Gauthier] to remain in the [house] for the longest amount of time."

Gauthier made several payments[1] toward the $225,000 called for in the Care Agreement, but ended up paying only $182,000 because taxes diminished the amount of money she had available.

Gauthier stayed in the home of Scott and Diane until May, 2008, when she entered a nursing home. She entered the nursing home because Scott could no longer lift her safely. Scott had had back surgery in September, 2005, after which he could not lift more than twenty pounds.[2]

On May 27, 2008, Gauthier applied for MassHealth long-term care benefits to pay for her care in the nursing home.

---

[1]Gauthier transferred to Scott $14,000 in April, 2006; $110,000 in May, 2006; and $58,000 in August, 2006. The first transfer may correspond to a payment of the same amount for the contractor to start the foundation; the others do not seem to correlate to specific payments to the contractor.

[2]According to Scott's testimony, while for a time Gauthier's mobility was sufficient that Scott could help her up when she fell, after a few years she gained weight and fell more frequently. By May, 2008, Scott concluded that he would not be able to assist Gauthier out of the house in an emergency.

MassHealth denied her application on October 29, 2008. She appealed to the Office of Medicaid board of hearings, and her fair hearing took place on February 3, 2009. On March 6, 2009, the hearing officer upheld the denial, finding that the Care Agreement had "no fair-market value" and was not reasonably enforceable, and that Gauthier had not demonstrated that the transfer was made solely for a purpose other than to qualify for MassHealth. The hearing officer found her ineligible for a period of 682 days, by dividing the $182,000 transfer by the $267 daily cost of a nursing home in Massachusetts.

Gauthier sought judicial review under G. L. c. 30A in Superior Court on March 30, 2009, and on February 19, 2010, a judge, acting on cross motions for judgment on the pleadings, affirmed the decision of the hearing officer. The judge ruled that the Care Agreement was a "nullity because at the time it was executed . . . Gauthier did not have the mental capacity" to contract and that "[d]ue to her dementia, there is nothing in the record to demonstrate [Gauthier's] intent" at the time of the transfer.

*Standard of review.* Gauthier, as appellant, has the burden "to demonstrate the invalidity of the administrative determination." *Andrews,* 68 Mass. App. Ct. at 231. When considering the administrative determination, the court must "give 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.' " *Springfield* v. *Department of Telecommunications & Cable,* 457 Mass. 562, 567 (2010), quoting from G. L. c. 30A, § 14(7). Thus, "[a] court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Embers of Salisbury, Inc.* v. *Alcoholic Bevs. Control Commn.,* 401 Mass. 526, 529 (1988), quoting from *School Comm. of Wellesley* v. *Labor Relations Commn.,* 376 Mass. 112, 120 (1978).

A court may overturn or modify the agency's decision only on narrow grounds, such as if it is "[u]nsupported by substantial evidence" or "[b]ased upon an error of law." G. L. c. 30A, § 14(7), as appearing in St. 1973, c. 1114, § 3. "Substantial evidence" is defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A,

§ 1(6), inserted by St. 1954, c. 681, § 1. When considering whether an agency's decision is supported by substantial evidence, "[t]he court shall make the . . . determination[] upon consideration of the entire record, or such portions of the record as may be cited by the parties." *Fortier* v. *Department of Pub. Utils.*, 342 Mass. 728, 734 (1961), quoting from G. L. c. 30A, § 14. "In sum, reasonable interpretations by an agency of its governing law, which are supported by substantial evidence, must be respected." *Forman*, 79 Mass. App. Ct. at 221.

*Disqualifying transfer.* The hearing officer's determination that the Care Agreement represented a disqualifying transfer because it was not for fair market value was supported by substantial evidence. The Care Agreement is similar in many respects to the contract found wanting in *Forman, supra* at 223. As in *Forman*, the Care Agreement provided for a lump-sum up-front payment in exchange for services of uncertain duration, with no explicit provision for a refund. See *id.* at 224-225. There were no specific benchmarks for the hours or standards of services to be provided. See *id.* at 224. Discrepancies also existed between the services called for in the Care Agreement and those actually provided; for instance, under the Care Agreement, Scott was to provide three meals per day to Gauthier, including lunch, but Gauthier was at adult day care during the day and paid for it using her Social Security income. See *ibid.* The Care Agreement permitted Scott to terminate it if Gauthier required assistance for bathing, toileting, etc., in which case he would retain the full amount of the payment. See *id.* at 225. But, as the hearing officer emphasized, Gauthier was "already in failing health" and in need of one-on-one supervision at the time she entered into the Care Agreement, meaning that termination "could occur at any point in time, including on day one of the contract." *Ibid.*

A significant difference from *Forman* is the fact that Gauthier received the benefit of a newly constructed living area. Even though she had been receiving food, shelter, and care at Scott's house for well over one year without compensating him, her accommodations after the addition was completed were substantially better than what she had before and were specifically designed for her needs. Nonetheless, as the hearing officer found, Gauthier received no ownership interest in return for her

contribution to the construction costs, while Scott and Diane retained full title to the house. Moreover, *at the time of the transfer*, it was within Scott's control to determine how long Gauthier would be able to enjoy the addition because he could terminate his own obligations at any time. See 130 Code Mass. Regs. § 515.001 (2007) ("For transferred resources, the fair-market value is based on the prevailing price at the time of transfer"). These factors provide substantial evidence to support the hearing officer's conclusion that the Care Agreement was not for fair market value, measured in terms of enforceable obligations at the time of the transfer. Therefore, the $182,000 paid by Gauthier under the Care Agreement represented a disqualifying transfer.[3]

*Exclusive purpose other than qualifying for benefits.* Gauthier contends that she should not be penalized for the disqualifying transfer because it was made "exclusively for a purpose other than to qualify for MassHealth." 130 Code Mass. Regs. § 520.019(F)(1). As the applicant, Gauthier bore the burden of establishing her intent "to the MassHealth agency's satisfaction." 130 Code Mass. Regs. § 520.019(F). Moreover, Federal law mandates a heightened evidentiary showing on this issue: "Verbal assurances that the individual was not considering Medicaid when the asset was disposed of are not sufficient.[4] Rather, convincing evidence must be presented as to the specific purpose for which the asset was transferred." State Medicaid Manual, Health Care Financing Administration Transmittal No. 64, § 3258.10(C)(2), available at http://www.cms.gov/Manuals/PBM/itemdetail.asp?itemIDCMS021927 (last visited Nov. 8, 2011) (State Medicaid Manual).[5]

The hearing officer's analysis on this issue is persuasive. She

---

[3]Given our resolution of this issue, we need not consider the alternative contention that the Care Agreement was not legally or reasonably enforceable by Gauthier. See *Forman*, 79 Mass. App. Ct. at 223-224.

[4]At the fair hearing, Scott and Diane testified that they entered into the Care Agreement and made the renovations to their house so that Gauthier could stay with them rather than entering a nursing home.

[5]The Health Care Financing Administration, now known as the Centers for Medicare and Medicaid Services (CMS), is "the Federal agency 'charged with administering the Medicaid program and promulgating its implementing regulations.' " *Andrews* v. *Division of Med. Assistance,* 68 Mass. App. Ct. 228, 231 n.3 (2007), quoting from *Rudow* v. *Commissioner of the Div. of Med.*

focused on (1) Gauthier's burden of proof, (2) her Alzheimer's dementia, which the hearing officer described as "a cruel and lengthy fatal disease that in its final stages . . . requires total care,"[6] (3) the immediately enforceable termination provisions of the contract; and (4) the up-front lump-sum payment, which left Gauthier without assets to pay for any nursing home care outside of her son's and daughter-in-law's home and provided the caregivers the full benefit of the contract regardless of when it was terminated. The hearing officer concluded that the agreement "points to the future when [Gauthier] would need more care than her son and daughter-in-law could provide" and would be left dependent upon public assistance. With that future expectation in mind, the agreement transferred control over the nursing home decision and the mother's financial resources to the caregivers. In these circumstances, the hearing officer's conclusion that Gauthier has provided insufficient evidence to prove that the payment of $182,000 to her son was solely for a purpose other than to qualify for MassHealth was reasonable. There was sufficient evidence to conclude that the contract was structured at least in part to shift the responsibility and cost of Gauthier's care to the State when the caregivers made the decision to do so.[7]

*Intent to receive valuable consideration.* MassHealth will also

*Assistance*, 429 Mass. 218, 227 n.14 (1999). Deference is accorded to CMS's interpretations of the Federal Medicaid statute and regulations. See State Medicaid Manual, Foreword § B(1) ("Instructions [in the State Medicaid Manual] are official interpretations of the law and regulations . . . ."); *Rudow, supra* at 227-228; *Andrews, supra* at 231-232; 130 Code Mass. Regs. § 515.002(B).

[6]The hearing officer suggested that the parties, especially the daughter-in-law who is a nurse, would have understood the disease's trajectory.

[7]In response to questions at oral argument, Gauthier submitted to us a MassHealth decision in which a hearing officer allowed the applicant's appeal under the "exclusively for a purpose other than to qualify for MassHealth" exception. See MassHealth Appeal No. 1015190 (Mar. 29, 2011). In that case, the applicant's daughter, under a power of attorney, obtained a home equity loan on the applicant's home and used the proceeds to build an addition onto the daughter's home, in which the applicant would live. The hearing officer there found that the applicant moved into the daughter's home "with the intention that she would remain there for the rest of her life," but stayed there for approximately eighteen months. There was no contract drafted regarding caregiver services, and therefore none of the provisions that troubled the hearing officer in this case. The health of the applicant there was not detailed. Furthermore, receipts from the construction of the in-law apartment established the fair market value of the construction costs. Regardless, whatever evidence

not impose a period of ineligibility if the applicant intended to receive "fair-market value or . . . other valuable consideration." 130 Code Mass. Regs. § 520.019(F)(2). The regulations define "valuable consideration" as a "tangible benefit equal to at least the fair-market value of the transferred resource." *Ibid.* The hearing officer did not make findings and rulings in regard to this particular provision. Such analysis is required on this record. The intent at issue here is different from the previous question regarding whether the transaction was "exclusively for a purpose other than to qualify for MassHealth."[8] Even if the parties contemplated future nursing home care at State expense, they may have intended to provide her fair compensation for her contribution. The evidence presented, including the mental and physical health of the claimant, the testimony of the son and daughter-in-law, the construction costs for the home improvements, the contract language, and the actions undertaken pursuant to the contract, supported conflicting interpretations of whether the parties intended that she would receive benefits, in terms of lodging and care, equivalent to her contribution. It is the hearing officer's responsibility to articulate her reasons for making a "choice between two fairly conflicting views." *Forman*, 79 Mass. App. Ct. at 221, quoting from *Embers of Salisbury, Inc.*, 401 Mass. at 529. This issue must be addressed on remand.

*Calculation of period of ineligibility.* We also discern a gap or error in the analysis regarding the calculation of the resulting ineligibility period. The hearing officer correctly explained that the number of days of ineligibility was equal to the total, cumulative, uncompensated value of all resources transferred by the nursing facility resident, divided by the average daily cost to a

that hearing officer found sufficiently convincing to establish a sole intent other than to qualify for benefits, the hearing officer in this case drew a different conclusion from the testimony, the physical and mental condition of the applicant at the time of the transfer, and the Care Agreement. It may be that a hearing officer could reasonably have drawn inferences to support Gauthier on this issue. However, it is not our role to second-guess the agency's determination even if we or a different hearing officer might "justifiably have made a different choice" based on the same evidence. *School Comm. of Wellesley* v. *Labor Relations Commn.*, 376 Mass. at 120, quoting from *Labor Relations Commn.* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971).

[8]Whether the parties intended to enter into a fair market transaction is also, of course, a different question from whether they succeeded in doing so.

private patient receiving nursing facilities in the Commonwealth. She then, however, without further explanation, divided the entire $182,000 by the daily cost of $267 to calculate a period of ineligibility of 682 days. In so doing, the hearing officer used the *total* value of the asset transferred rather than the *uncompensated* value thereof. Put differently, in the formula $(V-R)/C$ (see discussion, *supra*), the hearing officer correctly determined the value of the transferred asset $(V)$ and the daily cost of nursing home services $(C)$, but left out entirely or assigned a zero value for the compensation Gauthier received for the transfer $(R)$. See *Matter of Eisenhandler* v. *D'Elia*, 115 A.D.2d 477, 479 (N.Y. App. Div. 1985) (remanding for determination of compensation received for transfer); *Matter of Barbato* v. *New York State Dept. of Health*, 65 A.D.3d 821, 824 (N.Y. App. Div. 2009) (remanding for recalculation of ineligibility period).

In 130 Code Mass. Regs. § 515.001, "Uncompensated Value" is defined as "the difference between the fair-market value of the resource or interest in the resource at the time of transfer less any outstanding debts and the actual amount the individual received for the resource." Here, the fair market value of the resource at the time of transfer is clearly $182,000.[9] The more difficult issue is how to determine the actual amount Gauthier received for the resource.

Arguably, the hearing officer concluded that Gauthier received nothing in return for the $182,000. This may have been based on the hearing officer's placement of a zero value on the contract itself at the time of the transaction. At the same time, however, she recognized that Gauthier ultimately received services from Scott and Diane worth approximately $182,000. The hearing officer described her observation as follows: "It is only in retrospect do we know that the term [of Gauthier's care in Scott's home] was [twenty-two[10] ] months. . . . In retrospect we can say that she paid her son and daughter-in-law nearly the same amount that she would have paid to a nursing home for the

---

[9]There were, we recognize, multiple transfer payments totaling $182,000.

[10]We observe that the term in question, from March 30, 2006, to May 22, 2008, actually spans close to twenty-six months. This miscalculation does not detract materially from the hearing officer's essential point that the amount Gauthier paid under the Care Agreement was of the same magnitude as what she would have paid for nursing home care over that period.

same [twenty-two] months since MassHealth uses $8,010 as the average monthly private nursing home care cost . . . ."[11]

How to measure uncompensated value is not clear from the regulation itself, other guidance from MassHealth, the hearing officer's decision, or the briefing of the parties. Although the regulation provides that we determine the fair market value of the resource at the time of the transfer, in referring to the actual amount the applicant received for the resource, the regulation apparently does not specify the time at which to make that calculation.

The issue has not been the subject of much discussion in the case law in other States interpreting their Medicaid regulations. At least one court has remanded to recalculate the ineligibility period because the "determinations [of the agency] fail[ed] to account for the fair market value of services rendered between the date on which each [personal services agreement] was executed and the date on which the respective determinations [by the agency] were made." *Matter of Barbato, supra* at 823. Several other courts have also found that the value of services received after the contract was executed is relevant to the analysis of the fair market value of the transaction itself. See, e.g., *Austin v. Family & Soc. Servs. Admin.*, 947 N.E.2d 979, 983-987 (Ind. Ct. App. 2011) (indicating that valuable services pursuant to a contract may serve as compensation, but inquiry is fact-intensive); *Brewton v. Department of Health & Hosps.*, 956 So. 2d 15, 18-20 (La. Ct. App. 2007) (holding that nonduplicative services provided pursuant to personal care agreement constituted compensation for transfer and it was unreasonable to assign no value for such services); *Reed v. Department of Soc. Servs.*, 193 S.W.3d 839, 843-844 (Mo. Ct. App. 2006) (finding nonduplicative personal services provided for many years pursuant to contract to be fair and valuable consideration for transfer).

Assigning a zero value to the contract in the instant case seems particularly unsupported and unjustified,[12] where a handicapped-

---

[11]The hearing officer may have failed to take into account the value of the adult day care services that Gauthier received while she lived with Scott and Diane. We assume that a nursing home would be providing around-the-clock care while Scott and Diane did not care for her while she was at adult day care.

[12]As stated earlier, given the hearing officer's limited analysis on this issue, we cannot discern whether she assigned a zero value to the contract or just omitted compensated value from her analysis.

accessible area was designed and built for Gauthier's needs and she lived in that area and received significant care and services pursuant to the contract for an extended period of time. The fact that it was reasonable to conclude that the transaction was not for fair market value does not mean it was reasonable to conclude that it was for no value. This is especially true where the hearing officer found that value for the entire transfer was eventually received. We cannot discern any basis in the record for such a conclusion. A regulation designed to prevent improper use of Medicaid assistance cannot be employed to provide the government with what could be described as a windfall in these circumstances.

We are unprepared, however, to issue a definitive interpretation of the meaning of uncompensated value without the benefit of analysis of the provision from the agency itself. Its expert interpretation of its own regulation in the first instance is necessary for us to provide proper appellate review, and is entitled to deference if reasonable. See *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 (1991) ("We ordinarily accord an agency's interpretation of its own regulation considerable deference. . . . However, this principle is deference, not abdication, and courts will not hesitate to overrule agency interpretations when those interpretations are arbitrary, unreasonable, or inconsistent with the plain terms of the regulation itself"); *Springfield* v. *Department of Telecommunications & Cable*, 457 Mass. at 572 ("In light of the deference we give to the department's expertise and experience, particularly where this interpretive question arises under a complex statutory and regulatory framework, we conclude that the department's interpretation . . . is soundly based"); *Forman*, 79 Mass. App. Ct. at 221. Given the apparent gap in analysis and fact finding here, a remand is required on this issue as well.

We therefore vacate the judgment affirming the decision of the Office of Medicaid board of hearings. That decision is vacated, and the matter shall be remanded to the agency for further proceedings consistent with this opinion.

*So ordered.*