## ATTORNEY GENERAL vs. DEPARTMENT OF PUBLIC UTILITIES.[1]

Suffolk. October 6, 2008. - February 11, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Attorney General. Department of Public Utilities. Electric Company. Gas Company. Debt. Administrative Law,* Rate regulation. *Public Utilities,* Rate structure.

Discussion of the standard of review applicable to a petition for review of an order of the Department of Public Utilities. [195-196]

An appeal by the Attorney General from an order of the Department of Public Utilities (department) approving an amended tariff was timely, where the Attorney General was a party in interest but never received service of a "stamp" approval issued by the department or notice that the department planned to issue such an approval without a public hearing. [196-197]

The Department of Public Utilities (department) erred in approving a change in the way a utility company recovered gas and electric supply-related bad debt expense, following the department's adoption of a revised policy for treating the recovery of supply-related bad debt expense in an adjudicatory rate case involving a different company, where the department did not provide notice or conduct a hearing and investigation pursuant to G. L. c. 164, § 94 [197-201]; however, because the parties had not briefed the issue of the limits of the department's legal ability to provide a remedy, and the department was in the best position to consider the complex issues of law, policy, and equity that would be involved, this court remanded the matter to the department for consideration of a remedy [201-202].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 5, 2006.

The case was reported by *Greaney,* J.

*Alexander J. Cochis,* Assistant Attorney General (*Joseph W. Rogers,* Assistant Attorney General, with him) for the plaintiff.

*John E. Bowman, Jr.,* Special Assistant Attorney General, for the defendant.

*Scott J. Mueller* (*Meabh Purcell* with him) for Fitchburg Gas and Electric Light Company.

[1]General Laws c. 25, § 1, as amended through St. 2007, c. 19, § 21, reverted the Department of Telecommunications and Energy to the Department of Public Utilities (department).

BOTSFORD, J. The Attorney General appeals from an order of the Department of Public Utilities (department) approving a change in the way Fitchburg Gas and Electric Light Company, doing business as Unitil (company or Fitchburg),[2] recovers gas and electric supply-related bad debt expense; the order followed the department's adoption of a revised policy for treating the recovery of supply-related bad debt in an adjudicatory rate case involving a different company. The Attorney General argues that the department could not apply its revised policy to Fitchburg, and approve Fitchburg's proposed tariffs implementing that revised policy, without providing notice and conducting a hearing and investigation pursuant to G. L. c. 164, § 94. We agree with the Attorney General on this point, and vacate the department's order.

1. *Background.* The department regulates the rates that gas and electric companies may charge their customers. *Id.* Each such utility separately files a set of "tariff" documents[3] setting out its proposed rates with the department. These may include, as separate tariffs, both a fixed base rate and a supplemental cost of supply adjustment rate, or cost recovery formula, called respectively a "cost of gas adjustment clause" (CGAC) for gas supply, and a "default service" (DS) tariff for electric supply.[4]

The department permits a utility's rates to reflect the cost of

---

[2]Fitchburg Gas and Electric Light Company, doing business as Unitil (company), acted as an intervener on behalf of the department in this case, even though it did not formally request and was not granted leave to intervene. Thus, the company is properly a party in interest rather than an intervener.

[3]Tariffs are documents that set out the terms and conditions of the utility's services and rates. See *DSCI Corp.* v. *Department· of Telecomm. & Energy,* 449 Mass. 597, 600 n.5 (2007). See also Fitchburg Gas & Elec. Light Co., D.P.U. 07-71 (2008).

[4]The general methodology the department used at relevant times in establishing the rates a utility may charge its customers is not critical in this case, and has been described before. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy,* 440 Mass. 625, 627-628 (2004) (*Fitchburg I*), and cases cited. By way of summary, base rates are set prospectively on the basis of historical data, and "[o]nce established by the department, a base rate does not fluctuate with a [utility] company's actual costs, but only changes when the company files for, and pursuant to the procedures set out in G. L. c. 164, § 94, the department approves, a base rate change." *Id.* at 628. In contrast, through operation of department regulations, see 220 Code Mass. Regs. §§ 6.01 et seq. (1993) and 220 Code Mass. Regs. § 11.04(9) (1998), the cost of gas adjustment clause (CGAC) and default service (DS) tariffs

bad debt, the uncollectible revenue remaining after prudent efforts to collect on customer bills. See Bay State Gas Co., D.T.E. 05-27, at 175 (2005). The department's treatment of such debt has changed over time. In the context of a rate case initiated by Fitchburg in 2002, the department announced in its decision a policy that bad debt expense henceforth would be allocated between the base rate and the cost recovery formula, depending on whether the expense arose from distribution charges[5] or supply charges,[6] for both gas and electric rates. Fitchburg Gas & Elec. Light Co., D.T.E. 02-24/25, at 170-171 (2002).[7] The portion of bad debt recoverable through the cost recovery formula would be recalculated using an allocation factor determined during annual or semiannual reconciliation proceedings. *Id.* at 172. However, to maintain the company's incentive to minimize bad debt expense, the allocation factor would be applied to the level of bad debt expense approved for the test year, rather than the actual amount of bad debt incurred in the year in question. *Id.* at 170, 172. In 2005, in a rate proceeding initiated by Bay State Gas Company (Bay State Gas), the department reviewed its bad debt expense recovery policy in the context of gas supply; many parties participated, including the Attorney General (as intervener) and Fitchburg (as a limited participant). Bay State Gas Co., D.T.E. 05-27, *supra* at 165-190. The department noted that, since its 2002 decision, supply-related bad debt expenses had increased dramatically, in proportion to wholesale gas prices. *Id.* at 178. Requiring Bay State to comply with the recovery policy and formula set out in the department's 2002

---

permit a utility to recoup actual costs of procuring gas or generating electricity by passing those costs on to customers through periodic adjustments that reflect, in accordance with the formulas set out in the tariffs, market changes in such costs. See *Fitchburg I, supra.* See also *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.*, 368 Mass. 599, 602 (1975) (*COFFEE*).

[5]Distribution charges are those related to the delivery of gas or electricity to a customer over a utility company's local network of pipes or wires.

[6]Supply charges relate to the cost of the gas or electricity itself.

[7]The department indicated that as a matter of its policy favoring unbundling of supply services (i.e., gas production or electric generation) and distribution services (i.e., delivering gas or electricity to customers), the cost recovery formula should reflect the cost of supply, and the base rate should reflect the cost of distribution. See Fitchburg Gas & Elec. Light Co., D.T.E. 02-24/25, at 170-171 (2002).

Fitchburg rate decision would result in significant over recovery
or under recovery, depending on whether the market price de-
creased or increased. *Id.* at 183-184. Such unpredictable profits
or losses "could violate the Department's rate structure goal of
earnings stability," and "adversely affect the Company's earn-
ing stability, financial integrity, and its ability to attract capital."
*Id.* at 183, 185. The department therefore adjusted Bay State's
cost recovery formula to permit it to recover, dollar-for-dollar,
all of its actual supply-related bad debt, rather than an allocated
portion of the level established for the test year. *Id.* at 189-190.

On December 15, 2005, fifteen days after the department's
decision and order in the Bay State Gas proceeding, Fitchburg
filed a revised CGAC tariff with the department. The company's
rates for January 1 through April 30, 2006, had previously been
calculated on November 1, 2005, according to the CGAC formula
established in Fitchburg Gas & Elec. Light Co., D.T.E. 02-24/
25, *supra* at 170-171. The company now proposed to recalculate
its rates using a revised bad debt cost factor, in accordance with
the method approved for Bay State Gas in Bay State Gas Co.,
D.T.E. 05-27, *supra*.[8] The company further requested retroactive
recovery of under-recovered bad debt expense incurred during
2005.

The department notified the Attorney General of Fitchburg's
petition and, on December 22, 2005, "stamp" approved the com-
pany's amended tariff sheet (a process in which the commission-
ers of the department signed the front page of the filing, rather
than issuing a separate order). On February 3, 2006, the depart-
ment requested public comment as to the retroactive recovery
portion of the request, that is, the request to apply the amended
formula to bad debt expense for 2005. The request for comment

---

[8]To that end, the company deleted the language from its tariff defining bad
debt according to Fitchburg Gas & Elec. Light Co., D.T.E. 02-24/25, at 170-
171 (2002), and replaced it with language defining bad debt according to Bay
State Gas Co., D.T.E. 05-27, at 189-190 (2005). In its filing, the company
provided a tariff showing the following text, in which deleted portions were
struck through and added portions were underlined: "Bad Debt The uncollect-
ible expense attributed to the Company's gas costs. ~~Test year bad debt expense
as most recently approved by the Department, multiplied by an allocation fac-
tor determined by the Department in the Company's GAF proceedings. Such
allocation factor shall be based on a percentage of actual account write-offs
recorded and tracked for the CGAC billing components to total write-offs.~~"

did not mention the prospective portion of the company's request, from January 1, 2006, and going forward, or that the department had already approved that portion. Both the company and the Attorney General submitted comments. On March 7, 2006, the company filed a similar amendment to the bad debt cost factor in its DS tariff, requesting a rate increase to reflect actual (dollar-for-dollar) bad debt expense beginning on January 1, 2006, and going forward, and retroactive recovery for 2005.[9] The department issued a request for public comment on the retroactive portion of that request as well, and again received comments from the company and the Attorney General. In April of 2006, the department consolidated the two dockets. The department also served two sets of information requests on Fitchburg concerning its gas and electric filings, and the company responded to both requests. The department did not hold any form of public hearing on the filings.

On September 7, 2006, the department issued the order that is the subject of this appeal, allowing the company to amend its CGAC and DS tariffs to recover actual, dollar-for-dollar supply-related bad debt expense from December 1, 2005, onward (i.e., from the effective date of the Bay State Gas decision), and refusing to allow dollar-for-dollar recovery of such expense incurred before that decision. The order stated that the CGAC tariff from January 1, 2006, onward had been disposed of in the stamp approval, and noted that the Bay State Gas case, D.T.E. 05-27, had determined the issue of how supply-related bad debt expense should be treated. The Attorney General sought review of the department's order pursuant to G. L. c. 25, § 5. A single justice of this court reserved and reported the matter, without decision, to the full court.

2. *Discussion.* a. *Standard of review.* The Attorney General

---

[9]As in its gas filing (see note 8, *supra*), the company provided with its filing a tariff showing the definition of bad debt with deleted portions struck through and added portions underlined: "Bad Debt Costs which shall equal the uncollected costs associated with electric supply., calculated as follows, Bad Debt Costs [minus] Bad Debt Expense * Allocation Factor where: Bad Debt Expense are test year bad debt expense as approved by the Department in the Company's most recent base rate case, The Allocation Factor as approved by the Department in the Company's reconciliation filing. Such allocation factor shall be based on a percentage of actual account write-offs recorded and tracked for the DS billing components to total write-offs."

principally challenges the department's order as based on an error of law. The standard of review for petitions under G. L. c. 25, § 5, is well settled:

> "The burden of proof is on the appealing party to show that the order appealed from is invalid, and we have observed that this burden is heavy. . . . Moreover, we give deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority, pursuant to G. L. c. 30A, § 14. We shall uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7)."

*Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy*, 440 Mass. 625, 631 (2004) (*Fitchburg I*), quoting *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997). "We will 'accord[] due weight and deference to an agency's reasonable interpretation of a statute within its charge.' " *MCI Telecomm. Corp.* v. *Department of Telecomm. & Energy*, 435 Mass. 144, 151 (2001), quoting *Police Comm'r of Boston* v. *Cecil*, 431 Mass. 410, 413 (2000).

b. *Timeliness of appeal.* The department and Fitchburg assert that the Attorney General's appeal from the department's order approving the company's amended CGAC tariff for the period from January 1, 2006, and going forward must be dismissed because she failed to file her appeal within twenty days of the December 22, 2005, stamp approval of that amended filing. In the particular circumstances of this case, we disagree.

Appeal to this court from "any final decision, order or ruling of the commission" must be filed "within twenty days after the date of service of the decision, order or ruling." G. L. c. 25, § 5. "The commission shall serve such decision, order or ruling upon all parties in interest by mailing, postpaid, within one day of its being entered, and service shall be presumed to have occurred in the normal course of delivery of such mail." *Id.* The Attorney General was a party in interest under G. L. c. 30A, § 1, because she is entitled under G. L. c. 12, § 11E, to participate in the department's rate setting proceedings. See *American Hoechest*

*Corp.* v. *Department of Pub. Utils.*, 379 Mass. 408, 410 (1980) (applying G. L. c. 30A to G. L. c. 25, § 5). The Attorney General states that (1) she never received service of the stamp approval (or notice that the department planned to issue a stamp approval without a hearing); (2) she first learned of it from the department's decision and order dated September 7, 2006; and (3) she first obtained a copy of the stamp approval when a member of her staff, in preparation for this appeal, conducted a manual records check at the department. Neither the department nor the company offers any evidence to the contrary. Accordingly, because it appears from the record before us that the first notice received by the Attorney General of the department's stamp approval was in its September 7, 2006, order — an order from which the Attorney General did file a timely petition for appeal — we conclude that the Attorney General's appeal was timely filed. Contrast *Eastern Energy Corp.* v. *Energy Facilities Siting Bd.*, 419 Mass. 151, 152, 154-155 (1994) (where board notified utility and other parties of its final decision and their appeal rights under G. L. c. 25, § 5, and utility understood final decision had entered, failure to file notice of appeal within twenty days required dismissal of appeal).

c. *Suitability of hearing.* The Attorney General argues that the department may not approve a modification to the cost recovery formulas, having the effect of raising customer rates, without public notice, hearing, and investigation pursuant to G. L. c. 164, § 94. The third sentence of § 94 states:

> "Whenever the department receives notice of any changes proposed to be made in any schedule filed under this chapter which represent a general increase in rates, prices and charges for gas or electric service, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes after first causing notice of the time, place and the subject matter of such hearing to be published at least twenty-one days before such hearing in such local newspapers as the department may select."

Thus, if the change in the definition of bad debt expense set forth in Fitchburg's tariff sheets represented "a general increase

in rates, prices and charges," the department was required to hold a public hearing and investigation after publishing proper notice.

We first interpreted the application of § 94's public hearing requirement in *Consumers Org. for Fair Energy Equality, Inc. v. Department of Pub. Utils.*, 368 Mass. 599, 603 (1975) (*COFFEE*), shortly after the statute was amended to include the above-quoted language. Section 94 was amended by St. 1973, c. 816, § 2, in response to customer "agitation" after the department approved a change to a utility's rate schedules (which did not involve any fuel adjustment clause) without a public hearing. *Id.* In the *COFFEE* case, a group of consumers argued that § 94's phrase, "general increase in rates, prices and charges," also encompassed any change in rates resulting from the application of a fuel adjustment clause. *Id.* at 604. The court disagreed, noting that "the clauses were designed precisely to avoid those proceedings except where changes were being proposed in the clauses themselves." *Id.* at 607. We quoted approvingly from the department's position that the public hearing amendment to § 94 "required hearings for changes in any company's Fuel Clause [i.e., cost recovery formula] itself, but not for mathematical variations pursuant to such a clause." *Id.* at 604. More recently, we again explained that the "mechanically applied technical formula" by which the CGAC adjusts "is a fixed 'rate' that cannot be changed outside the hearing procedure mandated by G. L. c. 164, § 94." *Fitchburg I*, 440 Mass. at 638, citing *COFFEE*, 368 Mass. at 604.

A change to the mechanically applied technical formulas in the company's approved CGAC and DS tariffs is precisely what happened in this case. The amended tariffs each redefined one term in their respective formulas, and thus increased the rate charged to customers. The § 94 provisions applicable to proposals for a general increase in rates should have been followed, under the plain language of the statute and our cases.

The department and the company both argue that the § 94 hearing conducted in the context of the Bay State Gas case, D.T.E. 05-27, satisfied any hearing requirement that might apply to the company's amended CGAC and DS tariffs. As they both note, the department has the authority and discretion to set policies in adjudicatory rate cases that will have precedential effect

in future proceedings, and is not limited to the rule making process for this purpose. See *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 383 Mass. 675, 679 (1981). See generally *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 312-313 (1981). This observation, while correct, misses the point: although the department may establish a policy in an adjudicatory proceeding, the application of that policy to other parties may, depending on the nature of the policy at issue, require an additional process, as it does here. Section 94 requires that "[w]henever the department receives notice of any changes proposed [to a tariff] which represent a general increase in rates . . . it shall . . . *thereafter* hold a public hearing and make an investigation as to the propriety of such proposed changes" (emphasis added). The Bay State Gas proceeding, conducted and concluded by the department before the company filed its amended CGAC and DS tariffs at issue here, plainly cannot satisfy this requirement. The department's request-for-comment and information request process and ensuing order, which did not feature any form of public notice or hearing, was equally insufficient.

The department argues, unpersuasively, that this was not a "general" increase in rates. This is not a case in which implementation of the amended CGAC and DS cost recovery formulas was initially likely to result in decreased rates for customers, given that the amendments were intended to end Fitchburg's "under-recovery" of bad debt expense. Contrast *Attorney Gen.* v. *Department of Telecomm. & Energy*, 438 Mass. 256, 268, 270 (2002) (rate freeze, and fully offset increase in one part of rate, not "general increase"). Nor is it a case where the proposed changes in the CGAC and DS tariffs would increase rates charged to only a minority of customers; rather, the increases would affect all of the company's residential customers, because all of them had availed themselves of the company's supply services (in addition to distribution services). In sum, it is clear that the company's proposals in this case represented general rate increases by any reasonable interpretation of the term.[10]

There is nothing irrational or wasteful in requiring the depart-

---

[10]In fact, the company's cover letter for its gas filing explicitly stated: "A typical residential heating customer using 150 therms per month in the winter will see an increase of $3.92 [per month]," of which $3.90 was attributable to

ment to comply with the terms of § 94, despite the department's and the company's protestation. It is true that, in the Bay State Gas case, the Attorney General was an intervener, and the company a participant, so that all parties in this case previously have had a chance to comment on the department's current gas and electric supply-related bad debt policy. Bay State Gas Co., D.T.E. 05-27, at i, iv. But the Attorney General's complaint is not about the substance of the policy generally. Rather, she challenges the department's application of the policy to the company without consideration of any impact it might have on other elements of the company's rates, including in particular the cost of capital component of the company's base rates for gas and electricity.[11]

Nor is it necessarily problematic that a policy announced for one utility would not immediately apply to all of the others. Indeed, at the time of the Bay State Gas rate case in 2005, that company had not yet adopted the department's prior policy for bad debt expense, applied to Fitchburg in 2002. Bay State Gas Co., D.T.E. 05-27, at 167-168. The Bay State Gas case demonstrates the wisdom of a gradual adoption of new policy: in its decision, the department noted both that its 2002 policy did not function as predicted and the drastic consequences that Bay State Gas would have suffered if it had been immediately compelled to adopt that policy. See *id.* at 181, 182-183 n.118. If Bay State Gas could wait three years to consider adopting the supply-related bad debt policy applied to Fitchburg in 2002, Fitchburg could surely wait more than three weeks before adopting the bad debt policy applied to Bay State.

---

the revised bad debt formula, and "[s]imilar impacts will be seen for all customers." It is difficult to construe this as other than a "general increase in rates." G. L. c. 164, § 94.

[11]The Attorney General notes that the company's base rate includes a percentage set by the department in a § 94 rate case to represent a reasonable rate of return for investors. See, e.g., *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 780, 803-804 (1975). She argues that, if the company is able to recover bad debts dollar-for-dollar, it will face lower business risk, and require a lower rate of return to attract capital. Indeed, when the department reconsidered the company's base rate in a rate case that the company brought in 2007, the department stated: "In the Department's determination of an appropriate [allowed return] for Fitchburg, we have considered the reduction to the Company's financial risk brought about by the . . . bad debt reconciliation mechanism . . . ." Fitchburg Gas & Elec. Light Co., D.P.U. 07-71, at 139-140 (2008).

On the other hand, if a delay until the company's next general rate case filing would have been highly detrimental, the department had another option — a single-issue rate case. Single-issue ratemaking, that is, changing rates "to account for a cost increase in relation to a single item expense," is disfavored. *Attorney Gen.* v. *Department of Telecomm. & Energy*, 438 Mass. at 270-271. However, this is not an inflexible bar, but a "firmly enforced" prudential rule. Provision of Default Service, D.T.E. 02-40-B, at 20 (2003). The department has recognized an exception where (1) the increase "is dramatic and of such magnitude as to require the extraordinary treatment of [a] limited rate proceeding"; and (2) "a 'broad investigation [entailed in a general rate proceeding] would burden the ratepayers with a rate case expense in excess of any savings which might be attained by examining additional issues.' " *Id.* at 19, quoting Cambridge Electric Light Company, D.P.U. 490, at 2-3 (1981). The language of § 94, which requires the department to "make an investigation as to the propriety of such proposed *changes*" (emphasis added), is not inconsistent with this policy. Thus, it would have been within the department's discretion to hold a § 94 hearing and investigation only as to the company's request to change its treatment of bad debt (and any elements of the company's base rates that might be affected by the change), excluding evidence concerning unrelated issues, if it found that the need justified such a procedure.

d. *Remedy.* The remaining question concerns an appropriate remedy. The Attorney General does not argue that the additional bad debt expense allowed in the amended CGAC and DS cost recovery formulas and paid by the company's customers was itself unreasonable, but, as indicated previously (see note 11, *supra*), suggests that a full investigation might have resulted in a lower base rate, to reflect the lower business risk faced by the company because of dollar-for-dollar bad debt recovery. An equitable remedy might be one that permits the company to retain the rates collected due to bad debt expense, but requires it to disgorge whatever portion of the base rates should have been reduced to reflect lower business risk. However, "[i]t is well established that the department may not order retroactive adjustments (either up or down) of a gas company's base rate." *Fitchburg I*, 440 Mass.

at 637. See generally Krieger, The Ghost of Regulation Past: Current Applications of the Rule against Retroactive Ratemaking in Public Utility Proceedings, 1991 U. Ill. L. Rev. 983, 984. In light of this principle, the Attorney General contends that the only remedy available is to completely undo the application of the unlawfully modified tariffs, and require the company to refund all additional bad debt expense recovered through its cost recovery formulas, a power that the department retains. See id.

Neither the department nor Fitchburg has briefed the issue of the limits on the department's legal ability to provide a remedy, which was first raised in the Attorney General's reply brief. The company, however, does take the position that its recent electric rate case before the department, Fitchburg Gas & Elec. Light Co., D.P.U. 07-71 (2008), showed that the company was under earning in 2006, and thus that any further refund for that year would be inequitable. The company also suggests that any reduction in the base rate springing from a § 94 hearing would have been de minimis, further implying that a complete rollback of the department's order to account for that harm would be unfair. We think the department is in the best position to consider the complex issues of law, policy, and equity, raised by the issue of remedy in the first instance. See *DSCI Corp.* v. *Department of Telecomm. & Energy*, 449 Mass. 597, 608 (2007) (remanding to department for clarification of record and fashioning of appropriate remedy). Accordingly, we remand this matter to the department for consideration of a remedy.

3. *Conclusion.* For the reasons stated above, we remand the case to the county court where a judgment is to be entered vacating the department's stamp approval dated December 22, 2005, and its order dated September 7, 2006, and remanding the case to the department for further proceedings consistent with this opinion.

*So ordered.*