## NSTAR Electric Company *vs.* Department of Public Utilities.

Suffolk. December 8, 2011. - June 4, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Department of Public Utilities. Public Utilities,* Costs of service, Electric company, Rate structure, Rate setting. *Administrative Law,* Rate setting.

Discussion of the standard of review of an order of the Department of Public Utilities. [385]

This court declined to affirm an order of the Department of Public Utilities (department) conditioning its approval of an electric distribution company's petition to shift recovery of supply-related bad debt costs from the company's distribution rates to its supply rates on a corresponding further reduction in distribution rates, where the legal basis relied on by the department in support of the order was not discernable, and where the order failed to address a significant portion of the record and did not contain sufficient subsidiary findings of fact to demonstrate that the department's ultimate conclusions were supported by substantial evidence. [385-397]

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on June 18, 2010.

The case was reported by *Botsford,* J.

*Robert J. Keegan (Cheryl M. Kimball* with him) for the plaintiff.

*David A. Guberman,* Assistant Attorney General, for the defendant.

Lenk, J. Broadly speaking, electric distribution companies, such as the NSTAR Electric Company (NSTAR), provide two types of services: supply services and distribution services, each described below. Under the 1997 Electric Restructuring Act, St. 1997, c. 164, distribution companies must unbundle the rates they charge for each of their services, see St. 1997, c. 164, §§ 192, 193, amending G. L. c. 164, §§ 1, 1D, and are expected to recover fully their supply-related costs through their supply service rates. See D.T.E. 02-40-B at 15 (2002). This case concerns

the mechanics of NSTAR's attempt to shift the recovery of one of its supply-related costs, supply-related bad debt costs, from its distribution rates to its supply rates.

In 2007, NSTAR filed a petition with the Department of Public Utilities (department), see *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 460 Mass. 800, 801 n.2 (2011), through which it sought to begin recovery of its supply-related bad debt costs through its supply rates rather than, as before, through its distribution rates. In that petition, NSTAR asserted that it had stopped recovering such costs through its distribution rates in early 2006. Notwithstanding that contention, the department conditioned its approval of NSTAR's petition on a corresponding (in NSTAR's view, further) reduction in NSTAR's distribution rates.

We conclude that the department has failed to provide an adequate statement of its reasons for imposing the above condition. Specifically, we are unable to determine whether this aspect of the department's order rests on a determination that NSTAR did not follow the correct procedural path in removing supply-related bad debt costs from its distribution rates, or rather on a determination that NSTAR did not in fact remove such costs from its distribution rates at all. We conclude further that certain of the department's factual determinations are not adequately supported by subsidiary findings and that an aspect of the department's analysis is legally erroneous. The department's order is to be vacated and the matter is to be remanded to the department for further proceedings.

1. *Background.* As relevant here, NSTAR provides two distinct types of services: the procurement and supply of electric power (supply service) and the distribution of that electricity over power lines (distribution service). See 220 Code Mass. Regs. § 11.04 (2008); *Attorney Gen.* v. *Department of Pub. Utils.*, 453 Mass. 191, 192-193 nn.4-7 (2009). Generally speaking, NSTAR's customers pay for distribution services through distribution rates, and they pay for supply services — that is, for the power they actually consume — through supply rates.[1]

---

[1]The specific type of supply service provided by NSTAR is referred to as "default service." G. L. c. 164, § 1B (*d*). The department also uses the term "basic service." See D.T.E./D.P.U. 07-4-B at 1 & n.1 (2010).

*Id.* See 220 Code Mass. Regs. § 11.04; *Attorney Gen.* v. *Department of Pub. Utils., supra* at 193 nn.5, 6.

Although NSTAR enjoys a regulated geographic monopoly in electric distribution, see 220 Code Mass. Regs. § 11.04(2), it faces competition in the supply aspects of its business from "competitive" suppliers, that is, firms that generate or otherwise procure electricity without owning or operating the means to distribute electricity to consumers. See G. L. c. 164, § 1A, as appearing in St. 1997, c. 164, § 193. NSTAR competes with such competitive suppliers on the basis of its supply rates rather than its distribution rates. So that its supply rates accurately reflect supply costs and thus send the correct price signal to customers choosing between NSTAR and various competitive suppliers, the department's policy is that NSTAR's supply rate should ensure full recovery of all of its supply-related costs. See generally D.T.E. 02-40-B at 15 (2002).

One component of supply-related costs consists of those costs associated with customers defaulting on the supply-related components of their bills (supply-related bad debt costs). See D.T.E. 03-88 at 3 (2003). Yet, distribution companies like NSTAR historically have recovered at least part of these supply-related bad debt costs through their distribution rates rather than their supply rates. See D.T.E. 03-88A-F at 4 (2005). Accordingly, by a 2003 order, the department began proceedings to require distribution companies to move supply-related bad debt cost recovery from distribution rates to supply rates. D.T.E. 03-88, *supra.*

The proceedings commenced by that order were resolved by a settlement agreement between distribution companies and various other entities, including the Attorney General. This agreement, reached on January 21, 2005 (January Settlement), and approved by the department shortly thereafter, see D.T.E. 03-88A-F, *supra,* called for supply-related bad debt cost recovery to be moved from distribution rates to supply rates. However, art. 2.4 of the January Settlement specified that any such shift would not take place "until the next general distribution rate case in which a [d]istribution [c]ompany proposes or the [d]epartment directs the removal of [d]efault [s]ervice-related costs, or unless otherwise proposed to be adjusted by the [d]istribution [c]ompany, subject to approval by the [d]epartment." The department em-

phasizes that this clause ensured its ability to review the specifics of each distribution company's rate changes and to verify that such changes did not result in multiple recoveries of supply-related bad debt costs.

On December 6, 2005, NSTAR entered into a second settlement agreement with the Attorney General and others (December Settlement). The December Settlement was intended to have the same effect as a general distribution rate case and was approved as such by department order. See D.T.E. 05-85 (2005). The parties "agree[d] to an Alternative Rate Stabilization Plan that [would], on January 1, 2006, reduce the sum of the distribution rates [and a second category of rates] of NSTAR Electric below what they otherwise would have been and then ensure that the sum of those rates shall change only in a manner specified [by the December Settlement] for seven years."

NSTAR contends that the December Settlement removed supply-related bad debt cost recovery from NSTAR's distribution rates and that the department's order approving the settlement thus constituted approval by the department of NSTAR's removal of such costs from its distribution rates. On this basis, NSTAR filed in early 2007 a request to adjust upward its "basic service adder," a component of its supply-related "basic service rate," so as to recover supply-related bad debt expenses.

The department, however, took the position that the December Settlement "did not identify any changes to the level of bad debt included in [NSTAR's distribution rates] [nor] what level of supply-related bad debt, if any, was removed from [NSTAR's] distribution rates." D.T.E./D.P.U. 07-4 at 5 (2007) (initial order). The department therefore ordered that NSTAR offset any increase in its supply rates with a corresponding decrease in its distribution rates. Id. at 7.

NSTAR then filed a motion for reconsideration or clarification, which the department granted. D.T.E./D.P.U. 07-4-A (2007) (order granting reconsideration). However, after holding further proceedings, the department again determined that NSTAR could not increase its supply rates without a corresponding decrease in its distribution rates. See D.T.E./D.P.U. 07-4-B at 21 (2010) (final order on reconsideration). NSTAR thereafter filed a petition for review of the department's final order on reconsidera-

tion in the county court. See G. L. c. 25, § 5. A single justice reserved and reported the matter to the full court.

2. *Standard of review*. In reviewing an order issued by the department, "we give deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority [and] shall uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy*, 440 Mass. 625, 631 (2004), quoting *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997). See G. L. c. 25, § 5; G. L. c. 30A, § 14.

3. *Discussion*. We begin with three observations that neither party contests on appeal. The first is that NSTAR is only entitled to the relief it seeks on a showing that it has stopped recovering supply-related bad debt costs through its distribution rates. The second is that any such change in NSTAR's distribution rates must have taken place as part of a general rate case[2] or its equivalent. The third is that the December Settlement operates as the equivalent of a general rate case.

Where the parties disagree is on the meaning and effect of the December Settlement. NSTAR contends that the December Settlement incorporates by reference certain documents that were appended to it as exhibits. In NSTAR's view, these exhibits demonstrate that the December Settlement removed supply-related bad debt costs from NSTAR's distribution rates.

The department's position on appeal is that the December Settlement has binding effect only as to issues clearly and explicitly addressed in the text of the agreement. D.T.E./D.P.U. 07-4-B, *supra* at 15. The provisions of the December Settlement do not expressly mention bad debt costs. Therefore, in the department's view, the December Settlement did not effect the requisite change in NSTAR's distribution rates.

---

[2]Prior to approving any "general increase in rates, prices and charges for gas or electric service, [the department] shall . . . hold a public hearing and make an investigation." G. L. c. 164, § 94. This procedure is informally referred to as a "general rate case." See, e.g., *Attorney Gen.* v. *Department of Pub. Utils.*, 453 Mass. 191, 199 (2009).

NSTAR contends that the department's position on appeal is in tension with its actions in the course of the proceedings below. In particular, NSTAR notes that the department's order granting reconsideration stated that the department's "sole purpose" in reopening the record was to determine whether the distribution rates charged by NSTAR in 2006 provided for recovery of supply-related bad debt costs. NSTAR argues that such an inquiry would have been "completely pointless" if the plain language of the December Settlement was the only relevant issue before the department.

As suggested by the above paragraphs, the parties' arguments are somewhat at cross purposes. The department is focused on the plain language of the December Settlement — what the settlement said. NSTAR's primary focus is the effect of the December Settlement — what the settlement did. Notwithstanding the clarity of the department's position on appeal, this confusion finds its source in the department's three orders in this case, particularly the department's final order on reconsideration. As discussed, *infra*, we are unable to discern the legal basis relied upon by the department to support that order. Further, the order fails to address a significant portion of the record, and it does not contain sufficient subsidiary findings of fact to demonstrate that its ultimate conclusions are supported by substantial evidence. Because these infirmities leave us unable to determine whether the department's order is supported by sound reasoning and fact finding, "we decline to affirm the department's order, and remand for further proceedings." *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils., supra* at 859.

a. *The department's statement of reasons.* The deference we grant to an agency's determination of questions entrusted to its expertise places a "heavy burden" on parties challenging the department's orders. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils., supra* at 636. See also part 2, *supra.* Nevertheless, "[t]he principle of according weight to an agency's discretion . . . is 'one of deference, not abdication.' " *Moot* v. *Department of Envtl. Protection,* 448 Mass. 340, 346 (2007), *S.C.,* 456 Mass. 309 (2010), quoting *Boston Preservation Alliance, Inc.* v. *Secretary of Envtl. Affairs,* 396 Mass. 489, 498 (1986). Indeed, we are required to "carefully review the depart-

ment's findings for error." *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, *supra* at 868, quoting *Costello* v. *Department of Pub. Utils.*, 391 Mass. 527, 533 (1984). Such a review is only feasible when the agency has provided "a guide to its reasons," *Hamilton* v. *Department of Pub. Utils.*, 346 Mass. 130, 137 (1963), quoting *Leen* v. *Assessors of Boston*, 345 Mass. 494, 502 (1963), including a "determination of each issue of fact or law necessary to the decision," G. L. c. 30A, § 11 (8), "supported by adequate subsidiary findings." *Hamilton* v. *Department of Pub. Utils.*, *supra*, quoting *Leen* v. *Assessors of Boston*, *supra*.

(i) *Legal basis.* "While we can conduct a meaningful review of 'a decision of less than ideal clarity if the agency's path may reasonably be discerned,' we will not 'supply a reasoned basis for the agency's action that the agency itself has not given.' " *Costello* v. *Department of Pub. Utils.*, *supra* at 535-536, quoting *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys.*, 419 U.S. 281, 285-286 (1974). Here, we are unable to discern the legal reasoning supporting the department's orders. The "analysis and findings" provided by the department do not make clear whether the issue before the department was the interpretation of the language of the December Settlement or the determination of what costs in fact remained part of NSTAR's distribution rates on and after January 1, 2006.[3]

In its final order on NSTAR's motion for reconsideration, the department alternated its analysis between the language of the December Settlement and the effect of the December Settlement, without stating which rationale formed the basis for its decision.[4] As a result, we cannot tell whether the department

---

[3]The department's brief filed with this court is clearer, placing far greater emphasis on the contractual interpretation question than its orders in D.T.E./D.P.U. 07-4-A (2007) and D.T.E./D.P.U. 07-4-B, *supra*. However, an agency's ground of decision must be clear from its own order, not from "appellate counsel's post hoc rationalizations." *Motor Vehicle Mfrs. Ass'n of the U.S.* v. *State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983). Cf. *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 869 n.30 (1997) ("The barrage of footnotes in [the department's] brief is not an adequate substitute for the requisite subsidiary findings in its decision").

[4]Taken together, the department's prior orders suffer from the same confusion. In its initial order, the department stated as its reason for denying NSTAR's petition the absence of explicit language in the December Settlement addressing

was concerned with what the December Settlement said or with what NSTAR actually did.

At the beginning of the "analysis and findings" supporting the order, the department states that it had "reopen[ed] the record to permit [NSTAR] to provide additional evidence . . . that supply-related bad debt was removed from the distribution [rates] approved" by the December Settlement. D.T.E./D.P.U. 07-4-B, *supra* at 11. It then states that "for the reasons outlined below . . . [NSTAR] has failed to provide evidence to support its contention" that it had removed such costs from its rates in January, 2006. *Id.*

The "reasons outlined below," however, relate primarily to whether the text of the December Settlement clearly discussed the removal of supply-related bad debt from NSTAR's distribution rates, not whether such costs were in fact removed. Indeed, later in its analysis, the department emphasized that NSTAR was "incorrect" in suggesting that it could make its case for a nonrevenue-neutral rate adjustment without showing that the December Settlement "contain[ed] a specific and explicit provision providing for the transfer of supply-related bad debt." D.T.E./D.P.U. 07-4-B, *supra* at 15-16. Yet, as NSTAR points out, if this were true no rehearing would have been necessary.

Moreover, the department's two potential grounds of decision are inconsistent. As noted above, the parties agree that, under the January Settlement, NSTAR is only entitled to the relief it seeks on a showing that it has ceased recovery of supply-related bad debt costs through its distribution rates and that this change to its distribution rates took place as the result of a "propos[al]

NSTAR's bad debt costs. See D.T.E./D.P.U. 07-4 at 5-6 (2007) (because December Settlement was "silent on . . . bad debt," "[t]he level of bad debt — or any other expense — contained in these schedules was not reviewed, investigated, or approved by the [d]epartment," as required by January Settlement). Subsequently, in granting NSTAR's motion for reconsideration, the department stated that it wished to provide NSTAR with an opportunity to show that "[supply]-related bad debt costs have been removed from the distribution revenue requirement approved as part of the [December] Settlement," in view of its "policy of allowing distribution companies the opportunity to recover the appropriate amount of bad debt from ratepayers." D.T.E./D.P.U. 07-4-A, *supra* at 26. This language raises the question whether NSTAR had in fact removed bad debt costs from its distribution rates, not whether bad debt costs were expressly addressed by the December Settlement.

or . . . direct[ive]" in a general rate case. They agree also that a settlement agreement may substitute for a general rate case.

However, in interpreting the language of the December Settlement, the department argues that a settlement agreement only has legally binding effect to the extent of its "specific and explicit" language. The department contends further that the December Settlement lacks any specific and explicit language related to supply-related bad debt costs. On this theory, the December Settlement would not have any legally binding effect on NSTAR's supply-related bad debt costs. Further, even if NSTAR had stopped recovering supply-related bad debt costs in January, 2006, that change would not have resulted from a "propos[al] or . . . direct[ive]" in a general rate case. Accordingly, the terms of the January Settlement would still prevent NSTAR from obtaining the relief that it seeks.

It was incumbent on the department to explain its adverse decision, making clear which of these lines of reasoning it had adopted and why that ground for decision comports with relevant provisions of the applicable enabling statutes, regulations, and policies. See *Guarino* v. *Director of the Div. of Employment Sec.*, 393 Mass. 89, 92 (1984). As part of that explanation, the department should have set forth the showing that NSTAR was required to, but apparently did not make. That is, the department should have explained whether NSTAR was required to show either that the December Settlement reflected an agreement to remove supply-related bad debt costs from NSTAR's distribution rates or that the distribution rates adopted on January 1, 2006, did not include such costs, or both.

Absent such clarity, we are left to speculate as to the grounds for the department's order. See *Attorney Gen.* v. *Commissioner of Ins.*, 442 Mass. 793, 808 (2004). Such speculation prevents us from determining with confidence whether the reasoning in fact employed was factually supported and free from legal error.[5] It therefore "frustrate[s]" effective review. *Id.*, quoting *Massachusetts Auto. Rating & Acc. Prevention Bur.* v. *Commissioner of Ins.*, 401 Mass. 282, 292 (1987).

---

[5]Where, as here, one of the department's arguments rests on an error of law, see part 3.b, *infra*, it is of particular importance that the basis for the department's decision be articulated with clarity.

(ii) *Subsidiary findings.* An adequate statement of reasons must contain not only the department's factual conclusions, but also supporting subsidiary findings of fact. *Costello* v. *Department of Pub. Utils.*, 391 Mass. 527, 533 (1984). One function of subsidiary findings is to allow a reviewing court to "ascertain . . . whether the [department's] decision and [its] findings [are] supported by substantial evidence." *Packard Mills, Inc.* v. *State Tax Comm'n*, 345 Mass. 718, 723 (1963), quoting *Leen* v. *Assessors of Boston*, 345 Mass. 494, 501-502 (1963).

"[S]ubstantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' " *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). Further, a determination whether the department's conclusions are supported by substantial evidence must be made on the basis of the record as a whole. "[W]e are not required to affirm the [department] merely on a finding that the record contains [some] evidence from which a rational mind might draw the . . . inference" drawn by the department. *New Boston Garden Corp.* v. *Assessors of Boston*, *supra* at 466, quoting *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966).

Here, the department has not set forth sufficient subsidiary findings to allow meaningful review of its apparent conclusion that NSTAR's January 1, 2006, distribution rates include bad debt costs.[6] The department offers no explanation of what the December Settlement's January 1, 2006, adjustments to NSTAR's distribution rates actually accomplished if they did not remove supply-related bad debt costs from NSTAR's distribution rates. As a result, the only direct evidence on the intent and effect of the January 1, 2006, rate change comes from NSTAR's expert witness.[7] The department's failure to state whether and, if so, why it believes this testimony to be mistaken or flawed leaves us

---

[6]"[T]he obstacle is not [necessarily] the absence of evidence which may support the [department's] decision . . . but rather the absence of findings" demonstrating the existence of such evidence and explaining its import. *Mayor of Revere* v. *Civil Serv. Comm'n*, 31 Mass. App. Ct. 315, 323 (1991).

[7]NSTAR relies also on two additional exhibits, marked "NSTAR-1 (Settlement)" and "NSTAR-2 (Settlement)," which were not incorporated into the December Settlement but were nonetheless submitted to the department along

without the tools to evaluate, on the record as a whole, the reason-
ableness of the department's apparent conclusion that the
December Settlement had no effect on NSTAR's bad debt cost
recovery.[8]

Moreover, the limited evidence discussed by the department is
inconclusive. Neither the department's initial order, D.T.E./D.P.U.
07-4, *supra*, nor the department's final order on reconsideration,
D.T.E./D.P.U. 07-4-B, *supra*, provides any express subsidiary
findings to support a determination that NSTAR's January 1,
2006, distribution rates included NSTAR's supply-related bad
debt costs. The department's final order on reconsideration could
generously be read as reasoning that the absence of any language
addressing bad debt costs in the text of the December Settlement
indicates that the January 1, 2006, rates established by that agree-
ment left unchanged NSTAR's method of recovering supply-
related bad debt costs. As explained in part 3.b, *infra*, however,
the department's interpretation of the text of the December Settle-
ment is influenced by an error of law.

The order granting reconsideration, D.T.E./D.P.U. 07-4-A,
*supra*, makes two additional findings with regard to whether
NSTAR's January 1, 2006, rates provided for supply-related
bad debt cost recovery:[9] that even after January 1, 2006, NSTAR
continued to provide a distribution credit to certain of its custom-
ers, which would not have been necessary if NSTAR had in fact
removed supply-related bad debt costs from its distribution
rates; and that NSTAR's explanation of how bad debt costs had
been removed from its January 1, 2006, rates was not part of its
initial case before the department, but was instead presented for
the first time through its motion for reconsideration.

---

with the agreement. These exhibits relate to the rates NSTAR "would have
sought" in the absence of a settlement. They suggest that NSTAR would not
have sought a distribution rate that included bad debt costs.

[8]We would be hesitant to conclude that the department approved an
unexplained and unnecessary rate change, designed to accomplish nothing at
all. Cf. G. L. c. 164, § 94 (requiring department to "make an investigation as
to the propriety of . . . proposed [rate] changes" prior to approval).

[9]The department's final order references the department's first two orders in
these proceedings, see D.T.E./D.P.U. 07-4-A, *supra* at 13, and we assume,
arguendo, that the department may rely on subsidiary findings contained in
these two prior orders, but not discussed in the final order presently on
review.

The relevance of NSTAR's continuing provision of a distribution credit is called into question by the department's final order on reconsideration, which states that the "mistake" made by NSTAR in continuing to provide a distribution credit after January 1, 2006, "did not impact the [d]epartment's finding in D.T.E./D.P.U. 07-4, *supra* at 5-7 that supply-related bad debt was not removed from the distribution rates in [the December Settlement]." D.T.E./D.P.U. 07-4-B, *supra* at 18.

The relevance assigned by the department to the timing of NSTAR's submission of expert evidence is not apparent from the department's order. To the extent the department intended its observation on NSTAR's timing as a basis for a determination that NSTAR's expert witness was not credible, "such disbelief [does not alone] create affirmative" substantial evidence in support of the department's ultimate finding. *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass 37, 67 n.21 (1977), citing *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 251-252 (1966).

b. *Incorporation by reference.* Although the department's failure to provide an adequate statement of the legal and factual basis of its final order on reconsideration would alone require remand, we address also an error in the department's interpretation of the December Settlement.[10] Specifically, the department erred in concluding that the agreement did not expressly incorporate certain of the exhibits filed with the agreement. NSTAR argues that these exhibits, unlike the text of the agreement itself, clearly contemplate the removal of supply-related bad debt costs from NSTAR's distribution rates.

We begin with an observation on the principles applicable to the interpretation of the December Settlement. The consistent policy of the department has been to interpret approved settlement agreements in line with our general principles of contract law. See *Southern Union Co.* v. *Department of Pub. Utils.*, 458

---

[10]It remains unresolved whether the fact that the department "has legislatively been authorized to *approve* the agreement at issue here" would require that we "defer to the department's *interpretation* of the agreement" (emphasis in original). *Southern Union Co.* v. *Department of Pub. Utils.*, 458 Mass. 812, 819 (2011). For present purposes, it is sufficient to reaffirm that the department's misreading of the plain language of a "settlement" agreement it approved constitutes an error of law. See *id.* at 819-820.

Mass. 812, 820 (2011), and cases cited. Indeed, the department concedes that this policy governs the present case. Nonetheless, aspects of the department's orders appear to hold the parties to the December Settlement to an ill-defined heightened standard of clarity, see, e.g., D.T.E./D.P.U. 07-4-B, *supra* at 15-16 ("NSTAR Electric is incorrect in asserting that a settlement need not contain a specific and explicit provision providing for the transfer of supply-related bad debt from base distribution rates to basic service rates").[11]

Although the precise nature of the "explicit statement" that the department would require of NSTAR is not clear from the department's orders, the application of any such heightened clarity requirement would amount to a sub rosa change in department policy. Such a "new policy may not [generally] be retroactively applied where a prior agency policy existed." *Biogen IDEC MA, Inc.* v. *Treasurer & Receiver Gen.*, 454 Mass. 174, 190 (2009). See *Boston Gas Co.* v. *Department of Pub. Utils.*, 405 Mass. 115, 120-121 (1989). Absent an explanation from the department as to why a departure from its established policy is appropriate here, the December Settlement must be interpreted in line with the general principles governing the reading of any contract under Massachusetts law.[12]

---

[11]In contrast, Massachusetts law recognizes that contracting parties may memorialize their bargain in imprecise terms. Accordingly, "[w]e have stated that '[c]ontract interpretation is largely an individualized process,' " *Starr* v. *Fordham*, 420 Mass. 178, 190 (1995), and have noted the position that "any determination of [the] meaning [of a contractual term] . . . should only be made in the light of the relevant evidence of the situation and the relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.*, quoting Restatement (Second) of Contracts § 212 comment b (1981).

[12]The department suggests that the need for such heightened clarity was foreshadowed by its prior and consistent admonitions that "acceptance by the [d]epartment of any settlement does not constitute a determination as to the merits of any allegations or contentions made in a proceeding that are not expressly covered by the agreement." D.T.E./D.P.U. 07-4-B, *supra* at 17. Imprecision in the operative provisions of a contract does not turn such provisions into mere "allegations or contentions."

Nor does the language in art. 2.4 of the January Settlement impose a heightened standard of clarity concerning the manner in which the parties to the December Settlement could address the issue of bad debt cost recovery. Although that provision requires that the removal of bad debt costs from the

We turn now to the proper application of Massachusetts contract law to the question whether the December Settlement incorporates by reference any of its exhibits. "Incorporation by reference is a common tool in the drafting of contracts." *Artuso v. Vertex Pharms., Inc.*, 637 F.3d 1, 7 (1st Cir. 2011) (applying Massachusetts law). Nevertheless, "the language used in a contract to incorporate extrinsic material by reference . . . must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Northrop Grumman Info. Tech., Inc.* v. *United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008). See *M.L. Shalloo, Inc.* v. *Ricciardi & Sons Constr.*, 348 Mass. 682, 687-688 (1965).

Article 2.5 of the December Settlement provides: "The tariffs that would be implemented on January 1, 2006 and May 1, 2006, and supporting workpapers are set forth as 'Exhibit NSTAR-3 (Settlement)' through 'Exhibit NSTAR-22 (Settlement).' " Considered in the broader context of art. 2, we conclude that art. 2.5 incorporates the above-referenced exhibits as fully integrated components of the December Settlement.

In determining whether the language referring to exhibits 3-22 should be read only as referencing those exhibits as illustrative of the parties' agreement, or as fully incorporating those exhibits into the parties' agreement, we are guided first by the plain meaning of the language chosen by the parties. See *de-Freitas* v. *Cote*, 342 Mass. 474, 477 (1961). Here, the parties plainly stated that the rates to be implemented under the agreement were those "set forth in [the exhibits marked 'Exhibit NSTAR-3 (Settlement)' through 'Exhibit NSTAR-22 (Settlement)']." Even if this language were ambiguous, we would consider it in light of the "contract as a whole, in a reasonable and practical way."[13] *MCI WorldCom Communications, Inc.* v. *Department of Telecomm. & Energy*, 442 Mass. 103, 113 (2004),

distribution rates take place only after, as relevant here, such a change is "proposed" by the distribution company and subsequently "approv[ed] by the [d]epartment," it places no limitations on the manner in which such a change may be "proposed."

[13]Such a reading of ambiguous language in the context of the contract as a whole must take into account "the objects sought to be accomplished" by the contracting parties. *Shea* v. *Bay State Gas Co.*, 383 Mass. 218, 223 (1981),

quoting *USM Corp.* v. *Arthur D. Little Sys., Inc.,* 28 Mass. App. Ct. 108, 116 (1989).

The December Settlement as a whole is incomplete in material respects when read without the exhibits marked "NSTAR-3 (Settlement)" through "NSTAR-22 (Settlement)." Articles 2.2-2.4 of the December Settlement set forth, in summary terms, the changes that NSTAR was to make to each of these rates in January and May of 2006. Each of these articles refers generally to the aggregate change in the rates that would be charged by "NSTAR Electric." However, at the time of the agreement, NSTAR's electric distribution business operated through three separately regulated operating companies, each with its own rate schedule. The language of arts. 2.1-2.5 does not address how the changes contemplated by the agreement were to be apportioned between each operating company.[14] Absent the detail provided in the exhibits, the December Settlement would have provided no guidance as to the manner in which the rate changes would be allocated between the three operating companies' service areas, or between different categories of consumers.[15]

quoting *Bryne* v. *Gloucester,* 297 Mass. 156, 158 (1937). The department notes that art. 1.5 of the December Settlement defines the object of the contract as the resolution of "only those issues as specified in [art.] 2 and [art.] 3." However, art. 2.1, a subsection of art. 2, addresses itself to the broad issue of establishing an "Alternative Rate Stabilization Plan" governing all changes in NSTAR's distribution and transition rates for a period of seven years.

[14]The rate modifications contemplated in the exhibits differ slightly among the three operating companies, as do the over-all rates charged by each company.

[15]In approving the December Settlement, the department did require NSTAR to "file new tariffs . . . in place of the illustrative tariffs submitted with their initial filing." D.T.E. 05-85 at 32, 34 (2005). The department suggests that this requirement of filing a new tariff demonstrates that the tariffs were not incorporated into the agreement because the terms of the agreement required that the department accept the agreement "in its entirety"; otherwise, the agreement would be deemed withdrawn. However, the department's order also contains other modifications, "interpret[ations]," and clarifications of the terms agreed to by the settling parties. See, e.g., D.T.E. 05-85, *supra* at 31-32 (requiring "[d]epartment approval" over aspects of settlement implementation; "interpret[ing]" a section "to be contingent upon approval of the NSTAR Electric merger"). Accordingly, we conclude that the settling parties waived the requirement that the department approve the December Settlement "in its entirety," that is, without modification. See *McCarthy* v. *Tobin,* 429 Mass. 84, 88-89 (1999) (waiver of condition subsequent). We note also that the department only required NSTAR to revise the January 1, 2006, tariffs appended to the December Settlement in two specific respects, neither of which is relevant to this case. See *id.*

Such a result would be particularly anomalous in the context of an agreement that provides detailed procedures and formulas governing the manner in which NSTAR can modify its rates in the future.

The department contends that if it were bound by working papers and other addenda to settlement agreements, it could "no longer . . . rely on the principle that its approval of a proposed settlement approves only the settlement agreement's express terms," and that it would therefore be unable to continue to approve settlements for fear of the unforeseen consequences of such approval.[16] This argument is unavailing. Exhibits "NSTAR-3 (Settlement)" through "NSTAR-22 (Settlement)" were explicitly referenced in the December Settlement in a manner that any sophisticated party would have recognized as indicating their incorporation into the agreement. In such circumstances, we do not think that "presum[ing] that the [contents of these exhibits] were known and assented to" creates any potential for unfair surprise. *Trambly* v. *Ricard*, 130 Mass. 259, 260 (1881). That is not, of course, to suggest that the department is bound by every inference that could conceivably be drawn from a settlement agreement.[17] Rather, it is bound only by those interpretations of settlement language that are objectively supported by a settling party's "outward manifestations to the [department]." *Polaroid Corp.* v. *Rollins Envt'l Servs. (NJ), Inc.*, 416 Mass. 684, 696-697 (1993).

The department determined that the spreadsheets in the exhibits were not sufficiently labeled or explained so as to alert the department to any understanding by the settling parties that such documents provided for the removal of bad debt costs from NSTAR's distribution rates. D.T.E./D.P.U. 07-4-B, *supra* at 18. Certainly, the absence of clear labeling renders the import of the exhibits "not obvious to a layperson." *Springfield* v. *Department of Telecomm. & Cable*, 457 Mass. 562, 568 (2010). However, the agreements at issue were made between highly

---

[16]We do not preclude the department from addressing such concerns on a prospective basis. Cf. *Boston Gas Co.* v. *Department of Pub. Utils.*, 405 Mass. 115, 120-121 (1989).

[17]The department argues that to require it to "investigate and make findings on every element" of the rates included in a settlement would "defeat the purpose" of settling rather than proceeding to a fully litigated rate case. See D.T.E./D.P.U. 07-4-B, *supra* at 17.

sophisticated parties with a long course of dealing. A determination of what would have been reasonably apparent to the department, and to the other sophisticated settling parties, must take into account the department's "specialized technical knowledge in ascertaining [the] meaning and application" of the exhibits incorporated into the agreement. *Id.*, quoting *Pennsylvania R.R.* v. *Day*, 360 U.S. 548, 553 (1959).

Here, the department has failed to apply its "expertise to determine [the technical meaning of] the language in question" to the parties and to others experienced in the electric distribution industry. See *Springfield* v. *Department of Telecomm. & Cable, supra.* Specifically, the department has not addressed NSTAR's central arguments as to the meaning that the exhibits incorporated into the December Settlement would have had to parties experienced in the electric distribution industry.[18] Such arguments, which relate to industry practice and usage, are properly addressed by the department in the first instance. Cf. *id.* (because of its "technical competence, and experience . . . the department possesses the expertise to determine" in first instance meaning to accord specialized contractual provisions).

4. *Conclusion.* The department has failed to make findings and to provide a statement of the reasons for its decision adequate to support meaningful judicial review. Accordingly, we remand the case to the county court where an order is to enter vacating D.T.E./D.P.U. 07-4-B (2010) and remanding the matter to the department for "a statement of reasons, including subsidiary findings," of its conclusions of law and relevant facts. See *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 875 (1997).

*So ordered.*

---

[18]For example, the department has not addressed NSTAR's argument that it would have been objectively apparent to the department and the other settling parties that the distribution rate change planned for January 1, 2006, would effect a removal of NSTAR's supply-related bad debt costs because there was no other possible explanation for the planned adjustment.

We note also that NSTAR relies on two further exhibits which were not incorporated into the agreement, exhibits "NSTAR-1 (Settlement)" and "NSTAR-2 (Settlement)." See note 7, *supra.* A party may properly set forth "the transaction in all its length and breath" in order to shed light on the meaning of contractual language. *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 755 (1973), quoting *Saltzman* v. *Barson*, 239 N.Y. 332, 336 (1925).